# 24-2963-cv

## United States Court of Appeals

*for the*

## Second Circuit

BP PRODUCTS NORTH AMERICA INC.,

*Plaintiff-Appellant,*

– v. –

EXXONMOBIL CORPORATION,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

JONATHAN K. COOPERMAN
LUIS D. PEÑA-NAVARRO
KELLEY DRYE & WARREN LLP
*Attorneys for Plaintiff-Appellant*
3 World Trade Center
175 Greenwich Street
New York, New York 10007
(212) 808-7800

CP COUNSEL PRESS · (800) 4-APPEAL • (335165)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant BP Products North America Inc. ("BP"), by and through its undersigned counsel, hereby identifies its parent corporation and any publicly held corporation owning 10% or more of its stock as follows:

BP Products North America Inc.'s parent corporation is The Standard Oil Company. BP Company North America Inc. is the parent corporation of The Standard Oil Company. BP Company North America Inc.'s parent corporation is BP Corporation North America Inc. BP Corporation North America Inc.'s parent corporation is BP America Inc. BP America Inc.'s parent corporation is BP America Limited. BP America Limited's parent corporation is BP Holdings North America Limited. BP Holdings North America Limited's parent corporation is BP p.l.c., which is a publicly traded corporation organized under the laws of England and Wales.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..................................................................i

TABLE OF AUTHORITIES ...........................................................................iv

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF THE CASE...........................................................................2

    A.    BP's Predecessor Amoco's Purchase of Property that Was Formerly Part of a Refinery Operated by ExxonMobil's Predecessor Mobil ..................................................................2

    B.    The Discovery of Sub-Surface Petroleum in Greenpoint ...................3

    C.    In Return for a Payment of $1 Million, Mobil in 1993 Agreed to Defend and Indemnify Amoco With Respect to Third-Party Lawsuits Involving Environmental Conditions At Any Location Other Than Under The Amoco Terminal ..............................4

    D.    The 2004 Agreement Between BP and ExxonMobil Resolving a Separate Dispute...............................................................5

    E.    The Civil Lawsuits Seeking Compensatory Damages Due to the Alleged Migration of the Greenpoint Contamination ...................6

    F.    ExxonMobil's Refusal To Honor Its Obligation To Defend BP In the Civil Lawsuits ..................................................................9

    G.    BP Incurred $4,445,802.19 In Legal Fees that It Paid In the Ordinary Course of Business..............................................................11

    H.    ExxonMobil Indemnified BP In Connection With Settling The Lawsuits, But Refused To Honor Its Defense Obligation ..........12

    I.    At Summary Judgment, The District Court Ordered a Trial to Determine Which of BP's Defense Costs Were Incurred Defending Covered Claims ...........................................................13

    J.    The Trial Where the Jury Was to Determine Whether Attorneys' Fees Incurred by BP Were to Defend Covered Claims.....................................................................................15

SUMMARY OF ARGUMENT ........................................................................16

ARGUMENT ............................................................................................19

I. THE DISTRICT COURT ERRED AT SUMMARY JUDGMENT IN RULING THAT EXXONMOBIL DID NOT HAVE A DUTY TO PROVIDE BP WITH A COMPLETE DEFENSE TO THE CIVIL LAWSUITS ..................................................................19

    A. A Duty to Defend Is Determined By the Allegations of the Complaint ...................................................................20

    B. The District Court Erred by Sanctioning ExxonMobil's Unreasonable Delay, Which Is Not Permitted Under Illinois Law ...........................................................................21

    C. Because the District Court Correctly Found that ExxonMobil's Defense Obligations Were Triggered By Claims in the 23 Lawsuits, ExxonMobil Should Have Been Required to Provide Complete Defenses to the Entire Lawsuits ..........................................................................24

    D. The District Court's Summary Judgment Ruling Relied Upon Differences Between the Law Governing Insurance Contracts and Private Indemnity Agreements That Have No Relevance to The Current Situation .................................................29

    E. The District Court's Summary Judgment Ruling Creates an Incentive For an Indemnitor to Deny Its Defense Obligation .......................................................32

II. THE DISTRICT COURT ERRED REGARDING THE APPLICABLE LEGAL STANDARD FOR DETERMINING THE REASONABLENESS OF ATTORNEYS' FEES SOUGHT BY BP .........33

    A. The "Market Approach" To Determining the Reasonableness of Legal Fees Incurred .............................................34

    B. Illinois State Courts Also Apply the Market Approach When Judging the Reasonableness of Defense Costs ...................37

    C. The District Court Erred by Applying An Incorrect Standard of Review ..........................................................40

CONCLUSION ..........................................................................................41

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*American Service Insurance Co. v. China Ocean Shipping Co.*,
402 Ill. App. 3d 513 (2010).....................................................................38

*American Service Insurance Co. v.*
*China Ocean Shipping Co. (Americas) Inc.*,
7 N.E.3d 161 (Ill. App. Ct. 2014) ..........................................................38

*American Service Insurance Co. v.*
*China Ocean Shipping Co. (Americas) Inc., et al.*,
932 N.E.2d 8 (Ill. App. Ct. 2010) ................................................... 37, 38

*Balcor Real Estate Holdings v. Walentas-Phoenix Corp.*,
73 F.3d 150 (7th Cir. 1999)............................................................ 34, 35

*CARCO Grp., Inc. v. Maconachy*,
718 F.3d 72 (2d Cir. 2013) .....................................................................34

*Creative Vistas, Inc. v. Kolin*,
Nos. 1-16-1772, 1-16-1883, 2017 WL 4125631 (Ill. App. Ct. Sept. 13,
2017) .......................................................................................................38

*DiFabio v. Omnipoint Comms., Inc.*,
887 N.Y.S.2d 168, 66 A.D.3d 635 (2d Dept. 2009)...............................28

*Dominick's Finer Foods, LLC v. Eurest Servs., Inc.*,
No. 1-15-369 (LCL), 2015 WL 6735491 (Ill. App. Ct. Nov. 2, 2015).... 29, 30, 31

*Dupree v. Younger*,
598 U.S. 729 (2023)................................................................................19

*Ervin vs. Sears, Roebuck and Co.*,
469 N.E.2d 243 (Ill. App. Ct. 1984) ......................................................30

*Fragman Construction Co. v. Preston Construction Co.*,
274 N.E.2d 614 (Ill. App. Ct. 1971) ......................................................20

*Frain Camins & Swartchild v. Bank of America National Trust*,
No 91-C-8165, 1994 U.S. Dist. LEXIS 5891 (N.D. Ill. May 3, 1994) ...............22

*Great West Casualty Co. v. Marathon Oil Co.*,
No. 99-C-3101, 2003 U.S. Dist. LEXIS 2721 (N.D. Ill. Feb. 25, 2003)..............35

*Kaiser v. MEPC American Properties, Inc.*,
518 N.E.2d 424 (Ill. App. Ct. 1987) .................................................................40

*Keilman v. Sam's West, Inc.*,
No. 17-C-3683, 2018 U.S. Dist. LEXIS 162717 (N.D. Ill. Sept. 24,
2018) ..................................................................................................................20

*Kmart Corp. v. Footstar, Inc*,
777 F.3d 923 (7th Cir. 2015)................................................................... 26, 27

*Kmart Corporation v. Footstar, Inc.*,
No. 09-CV-3607, 2012 WL 1080262 (N.D. Ill. Mar. 30, 2012), *aff'd in
part, rev'd in part*, 777 F.3d 923 (7th Cir. 2015)......................................... 26, 27

*Litterer v. United States*,
545 F. Supp. 3d 625 (N.D. Ill. 2021) ........................................................ 22, 23

*Maneikis v. St. Paul Insurance Co. of Illinois*,
655 F.2d 818 (7th Cir. 1981).................................................................... 24, 25

*McHenry Sav. Bank v. Autoworks of Waucanda, Inc.*,
924 N.E.2d 1197 (Ill. App. Ct. 2010).............................................................40

*Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*,
200 F.3d 518 (7th Cir. 1999).........................................................................36

*Oscar Gruss & Son, Inc. v. Hollander*,
337 F.3d 186 (2d Cir. 2003)...........................................................................34

*Perry v. City of New York*,
78 F.4th 502 (2d Cir. 2023) ...........................................................................19

*Sears, Roebuck v. Insurance Company of North America*,
No 89-C-5795, 1900 U.S. Dist. LEXIS 10421 (N.D. Ill. Aug. 8, 1990) ....... 24, 25

*Solo Cup Co. v. Federal Insurance Co.*,
619 F.2d 1178 (7th Cir. 1980) .......................................................................25

*Taco Bell Corp. v. Continental Casualty Co., et al.*,
388 F. 3d 1069 (7th Cir. 2004)................................................................. 35, 38

*Utica Mutual Insurance Co. v. David Agency Insurance, Inc.*,
327 F. Supp. 2d 922 (N.D. Ill. 2004) .............................................................21

*Value Wholesale, Inc. v. KB Insurance Co, Ltd.*,
No. 18-cv-5887, 2020 WL 6393016 (E.D.N.Y Nov. 2, 2020)...........................36

*Wilda v. JLG Industries, Inc.*,
  470 F. Supp. 3d 770 (N.D. Ill. 2020) ......................................................... *passim*

## Statutes and Other Authorities:

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1332 .......................................................................................1

## JURISDICTIONAL STATEMENT

The District Court (E.D.N.Y, Judge Pamela K. Chen) had jurisdiction over this case pursuant to 28 U.S.C. § 1332 as there was diversity of citizenship between Plaintiff BP Products North America Inc. ("BP") and Defendant ExxonMobil Corp. ("ExxonMobil") and the amount in controversy exceeded, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000). The District Court denied BP's post-trial Motion for a New Trial on September 30, 2024. BP timely filed a Notice of Appeal on October 29, 2004. BP appeals from a final judgment and this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

A.     Whether the District Court erred by requiring a jury trial, rather than granting BP summary judgment based upon the "complete defense" rule of Illinois law, the law applicable to the indemnity agreement at issue, under which ExxonMobil was obligated to provide BP with a complete defense to 23 lawsuits when allegations in the Complaints seeking over $1 billion for personal injuries and property damages were within ExxonMobil's defense and indemnity obligation, even though several other allegations were outside the scope of the indemnity?

B.     Whether the District Court erred by requiring a jury trial to assess whether attorneys' fees incurred by BP were within the scope of ExxonMobil's

1

defense and indemnity agreement when Illinois law provides that defense obligations are triggered by the allegations of the Complaints at issue?

C.     Whether the District Court erred in not granting BP summary judgment as to the amount of its legal fees when those fees were presumptively reasonable under the applicable "Market Approach"?

## STATEMENT OF THE CASE

**A. BP's Predecessor Amoco's Purchase of Property that Was Formerly Part of a Refinery Operated by ExxonMobil's Predecessor Mobil**

From the late 19th century up through 1968, ExxonMobil's predecessor Mobil Oil Company ("Mobil") owned property located in Greenpoint, Brooklyn.  Until 1965, Mobil used a portion of that property to operate a large oil refinery.  A.46-47, ¶ 3; A.154-55.[1]

In 1968, BP's predecessor Amoco Oil Company ("Amoco") purchased an interest in an approximately 10 acre parcel of the former Mobil refinery.  A.47, ¶ 5; A.145-47.  Beginning in 1970, the property was used as a storage and distribution terminal for retail petroleum products.  *Id.*  Amoco subsequently became the sole owner of the property.  A.47, ¶ 5.

---

[1] References to the Joint Appendix are designated "A.___."

**B. <u>The Discovery of Sub-Surface Petroleum in Greenpoint</u>**

In 1978, the United States Coast Guard retained an environmental consulting firm, Geraghty & Miller, Inc., to investigate the nature and extent of sub-surface oil by the former refinery property after observing oil seeping into the Newtown Creek. A.82, A.101. Geraghty & Miller issued a report finding that there was a total of 17 million gallons of petroleum below areas of Greenpoint that was attributable to spills at the former Mobil refinery:

> The Amoco storage facility is not the source of the spill as the facility only started operating in 1969 and does not handle the type of product found in the subsurface.
>
> * * *
>
> A former Mobil refinery shut down in 1965 and demolished in 1968 occupied the present Amoco site and adjacent properties.
>
> * * *
>
> Based on the physical characteristics of the spill, age of the product, and its chemical characteristics, it is concluded that the source of the product is the former Mobil refinery.

A.78-79. The report found that the plume attributable to the former Mobil refinery extended into Greenpoint commercial and residential areas. A.74, ¶ 4; A.76, ¶ 12; A.79, ¶ 27; A.98.

**C. In Return for a Payment of $1 Million, Mobil in
1993 Agreed to Defend and Indemnify Amoco With
Respect to Third-Party Lawsuits Involving Environmental
Conditions At Any Location Other Than Under The Amoco Terminal**

After sub-surface contamination was discovered in Greenpoint, Amoco installed a remediation system to begin cleaning up the property purchased from Mobil. A.51. A dispute subsequently arose between Amoco and Mobil over responsibility to remediate environmental conditions in Greenpoint. *Id.* On May 6, 1993, Amoco and Mobil entered into a settlement agreement (the "1993 Agreement") to resolve issues related to sub-surface petroleum in Greenpoint, referred to as the "Greenpoint Contamination." A.1473, 1488-89. The 1993 Agreement also resolved unrelated issues between the two companies. A.1475-88.

The 1993 Agreement defined the "Greenpoint Contamination" as the "free product plume, including any migration of such plume" in the Greenpoint area of Brooklyn. A.1473-74. Under the 1993 Agreement, Amoco agreed to pay Mobil $1 million and, in exchange, Mobil agreed to waive and release Amoco for all claims relating to environmental contamination located at any location aside from under the Amoco terminal. A.1488-89.

Mobil also agreed to defend and indemnify Amoco for all lawsuits involving subsurface contamination located at any location aside from under the Amoco terminal:

4

> Indemnification of Amoco.   Mobil and its Affiliates hereby agree to defend, indemnify and hold harmless Amoco and its Affiliates from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including any attorney's fees), asserted by governmental or nongovernmental plaintiffs, complainants, or claimants, arising out of or otherwise relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume which are not physically located under Amoco's Brooklyn terminal property.

A.1489.

The 1993 Agreement also provided that its "terms, conditions and covenants" were binding upon "the successors and assigns of the parties hereto." A.1490. In addition, it was agreed that "[t]his Agreement shall be governed, construed and administered in accordance with the laws of the State of Illinois." A.1491.

## D. The 2004 Agreement Between BP and ExxonMobil Resolving a Separate Dispute

After the 1993 Agreement was executed, Amoco brought a lawsuit to address the continued migration of petroleum through the sub-surface and under the Amoco terminal. A.53. In February 2004, an agreement was reached between BP, as the successor to Amoco, and ExxonMobil, as the successor to Mobil (the "2004 Agreement"). A.1492. Under the 2004 Agreement, ExxonMobil agreed to maintain hydraulic control on the western side of the BP terminal (formerly the Amoco terminal) to prevent petroleum products "from migrating in the future onto the BP

Property from the western off-site areas." A.1494, §2.1. It was also agreed that BP would maintain hydraulic control on the southern boundary of the BP terminal. A.1494-95, §2.2.

BP provided a limited release as part of the 2004 Agreement from (1) the claims made in the lawsuit and (2) for "responsibility for remediating contamination at the Greenpoint Area." A.1508-09, § 6(b). ExxonMobil provided a similar limited release to BP. A.1507-08, § 6(a).

The 2004 Agreement releases did not involve third-party claims for personal injury or property damage "arising out of or otherwise relating in any way to environmental contamination…which are not physically located under Amoco's Brooklyn terminal property" which Mobil agreed in the 1993 Agreement to defend in exchange for the payment of $1 million. A.1489. Indeed, the 2004 Agreement provided that "[e]xcept where amended by this Agreement, the 1993 Agreement shall remain in full force and effect." A.1509, § 8.

## E. The Civil Lawsuits Seeking Compensatory Damages Due to the Alleged Migration of the Greenpoint Contamination

Beginning in October 2005, a series of lawsuits were brought against ExxonMobil, BP and other companies by residents in the area of Greenpoint, Brooklyn alleging property damages and personal injuries as a result of petroleum contamination attributable to the former Mobil refinery. A.54. The first lawsuit in New York State Supreme Court, Kings County was *Baumbach, et al. v. ExxonMobil*

*Corporation, et al.*, Index No. 37655.2005. The *Baumbach* Complaint was originally brought on behalf of 9 individuals and through subsequent amendments was expanded to over 390 individual plaintiffs. A.1518 - 1685.

In the introductory paragraph, plaintiffs claimed that petroleum had migrated under their homes causing them personal injuries and property damage, exactly the type of claim Mobil agreed to defend and indemnify in return for a payment in 1993 of $1 million:

> Due to the negligent, willful, and/or wanton actions of the various defendants, millions of gallons of oil and oil products have been released into the ground and migrated onto plaintiffs' properties causing plaintiff to suffer injury and damages to their persons and properties.

A.1527, ¶ 2.

The plaintiffs were all owners or renters of residential or commercial properties located throughout Greenpoint and Williamsburg, many far from the commercial section of Greenpoint where the BP terminal was located. A.54-55, 178, 1518-1685. The *Baumbach* Complaint cited the Geraghty & Miller report and alleged that a plume of up to 30 million gallons of oil products had migrated from the former Mobil refinery property and "extended under 55 acres of commercial, industrial, and residential Greenpoint." A.1697, ¶ 411.

The Complaint relied upon the Geraghty & Miller Report, which concluded that the Mobil refinery was the source of sub-surface contamination. A.79, ¶ 27.

7

The Complaint did not allege any independent spills by BP at any time that Amoco or BP operated the terminal property. A.1696-1705.

The *Baumbach* Complaint Plaintiffs brought a number of tort claims, alleging the migration of petroleum products under their properties. A.1705-14, ¶¶ 441-490. Unspecified damages were sought for property damage and personal injuries, as well as punitive damages. A.1716-18.

Twenty-two other lawsuits on behalf of over 300 Plaintiffs were subsequently brought by the law firm Napoli Bern Ripka in New York State Supreme Court, Kings County against ExxonMobil, BP and several other companies (collectively the "Napoli lawsuits"). A.56. One of the Napoli lawsuits was brought as a putative class action on behalf of all residents of Greenpoint, Brooklyn and was subsequently removed to the Eastern District of New York, *Spiroff, et al. v. ExxonMobil Corporation, et al.*, Index No. 1:06-cv-02865. A.56; A.1722-1763.

Just as in the *Baumbach* lawsuit, the plaintiffs in the Napoli lawsuits alleged that petroleum attributable to the former Mobil refinery had migrated under their homes and businesses. For example, plaintiffs in *Spiroff et al. v. ExxonMobil Corporation, et al.*, alleged:

> [T]here is contamination located in or about various areas and neighborhoods of the Greenpoint, as well as surrounding communities, which has migrated and continues to migrate throughout these areas and neighborhoods and onto the properties of plaintiffs at

> dangerous levels, including at concentration levels in excess of federal and/or state regulatory limits.

A.1734, ¶ 57.

The plaintiffs in the Napoli lawsuits were similarly located throughout Greenpoint and alleged a variety of legal theories attributable to petroleum that migrated under their properties. A.180-97; A.1740-57, ¶¶ 87-183. They sought, *inter alia*, $1 billion for personal injuries and property damages and $50 billion in punitive damages. A.1757-61, ¶¶ A-J. As with the *Baumbach* Complaint, the Napoli lawsuits did not allege any independent spills by BP at any time that Amoco or BP operated the terminal property. A.1730-38.

## F. ExxonMobil's Refusal To Honor Its Obligation To Defend BP In the Civil Lawsuits

In May 2006, BP tendered the defense of the *Baumbach* and Napoli lawsuits to ExxonMobil and stated as follows:

> The plaintiffs in [*Baumbach* and the Napoli lawsuits] allege, among other things, that they have been injured as a result of petroleum contamination beneath their residences in Greenpoint. These claims, no matter how narrowly or broadly one construes them, necessarily relate to "environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume which are not physically located under Amoco's Brooklyn terminal property." As a result, the claims asserted in *Baumbach* and [the Napoli lawsuits] fall within the category of claims for which ExxonMobil is contractually obligated to defend and indemnify BP…."

A.199-201, (quoting the 1993 Agreement).

ExxonMobil did not respond to BP's tender until nine months later. A.203-07. It's February 7, 2007 response stated that "[t]his letter is for settlement purposes only. It shall have no force or effect whatsoever, either as an offer or otherwise, unless and until signed below…by an authorized representative of ExxonMobil and BP." A.206. Rather than accepting BP's tender, ExxonMobil sought to modify the 1993 Agreement by narrowing the scope of the indemnity with a number of exclusions, including excluding from the indemnity claims for gross negligence, reckless or intentional conduct, and claims for punitive damages. A.204-05. Since the civil Complaints were alleging "reckless" conduct and "willful, and/or wanton actions and/or intentional failures" and sought punitive damages, ExxonMobil was asking BP to modify the 1993 Agreement so that there would be no coverage for the civil lawsuits.[2] *See* A.1707, ¶ 451; A.1711, ¶ 474; A.1760, ¶ J.

ExxonMobil did not bring a declaratory judgment action seeking a declaration that it had no obligation to provide BP with a defense in the *Bambach* and Napoli lawsuits. Instead, almost two years after tendering the defense, BP and ExxonMobil

---

[2] The February 7, 2007 letter also required BP to release claims for defense and indemnity in two lawsuits brought by the environmental group Riverkeeper and Brooklyn Borough President Marty Markowitz relating to area petroleum contamination. A.204. However, at the same time that BP tendered its defense, ExxonMobil sought to implead BP as a necessary party to the *Riverkeeper* and *Markowitz* lawsuits. A.209. That motion was denied without prejudice. A.209-20. Accordingly, ExxonMobil's February 7th letter sought to have BP release defense and indemnity claims for the *Riverkeeper* and *Markowitz* lawsuits at the same time that ExxonMobil was trying to implead BP in those lawsuits.

entered into a series of Tolling Agreements to toll the statute of limitations on BP's

claim for the defense of *Baumbach* and the Napoli lawsuits. A.222-47.

In each of those Tolling Agreements, ExxonMobil acknowledged that it had

refused to provide BP with a defense of the civil lawsuits:

> WHEREAS, there is a disagreement amongst the parties
> as to whether ExxonMobil is obligated to defend and
> indemnify BP in the Civil Lawsuits pursuant to the 1993
> Agreement, and ExxonMobil has at the present time
> declined BP's request for defense and indemnity in the
> Civil Lawsuits.

A.222.

As a result of ExxonMobil's refusal to honor its defense obligations, BP was

required to retain and pay legal counsel to defend itself in the pending 23 lawsuits.

A.60, 65-66. The lawsuits were actively litigated until the last one was finally

resolved in 2013. A.60. At no time when the lawsuits were being litigated did

ExxonMobil agree to honor its defense obligations under the 1993 Agreement. A.60,

67.

## G. BP Incurred $4,445,802.19 In Legal Fees that It Paid In the Ordinary Course of Business

Defending the lawsuits was a complex undertaking involving, for example,

depositions of a majority of the approximately 700 plaintiffs, highly technical

environmental science issues such as sub-surface migration of petroleum products

and vapor intrusion, expert opinions regarding alleged personal injuries and property

11

damages for the approximately 700 plaintiffs, as well as inspections of the residential and commercial properties at issue. A.60, 65-66.

In total, BP incurred $4,445,802.19 in reasonable and necessary legal fees, expert fees and associated costs defending these lawsuits. A.65-66. That is less than half of the $10,776,051.25 that ExxonMobil incurred in legal fees and expert costs to defend the same lawsuits. A.66-67; A.1764.

The hourly rates charged by attorneys representing BP were the same or less than the rates charged by attorneys representing ExxonMobil. *Id.* BP paid its legal and expert fees in the normal course of business. A.66-67.

## H. ExxonMobil Indemnified BP In Connection With Settling The Lawsuits, But Refused To Honor Its Defense Obligation

Despite ExxonMobil's refusal to honor its defense obligations, ExxonMobil in fact subsequently honored its obligation under the 1993 Agreement to indemnify BP. A.67, ¶ 25. ExxonMobil negotiated settlements for both the *Baumbach* and *Napoli* lawsuits without any input from BP. *Id.* Those settlements provided for a full release and discharge of all claims against both ExxonMobil and BP in exchange for material payments made solely by ExxonMobil. *Id.* At no time prior to these settlements did ExxonMobil inform BP that ExxonMobil would honor its indemnity obligation and include BP in the settlement agreements it was negotiating. *Id.*

12

## I. At Summary Judgment, The District Court Ordered a Trial to Determine Which of BP's Defense Costs Were Incurred Defending Covered Claims

After entering into a number of Tolling Agreements, on June 1, 2019 BP brought this lawsuit in the Eastern District of New York, *BP Prods. N. Am., Inc. v. ExxonMobil Corp.*, Case No. 1:19-cv-03288, seeking to be reimbursed for the legal fees and costs BP paid to defend the Greenpoint civil lawsuits, plus interest. A.18.

On September 28, 2022, the District Court granted in part, and denied in part, BP's motion for summary judgment. SPA.1-34.[3] The District Court rejected ExxonMobil's defense that the 2004 Agreement released ExxonMobil's obligation under the 1993 Agreement to defend third-party claims for personal injuries and property damages. SPA.17. The District Court held that the 2004 Agreement only released ExxonMobil's obligation to defend third-party claims seeking to require BP to remediate subsurface environmental conditions. SPA.18-19.

The District Court further held that "it is clear that the parties [to the 1993 Agreement] intended to allocate responsibility to ExxonMobil regardless of culpability" to defend third-party claims for personal injuries and property damages. SPA.14. The District Court found that Plaintiffs' claims in the Greenpoint Complaints, seeking over a $1 billion due to petroleum that migrated under their properties, were within the scope of the defense obligation:

---

[3] References to the Special Appendix are designated "SPA.___."

> The Court therefore concludes that ExxonMobil, "confronted with allegations in a complaint that could give rise to liability under the indemnity provision," did not have a good faith basis to refuse to defend BP against these claims.

SPA.22.

The District Court, however, found that ExxonMobil was not obligated to defend and indemnify against third-party claims seeking to require BP to remediate subsurface petroleum, as opposed to claims seeking money damages from BP. SPA.26. The District Court cited a single paragraph of the Complaint where, after seeking damages for personal injuries and property damages, *see* A.1704, ¶¶ 437-38, the plaintiffs sought "injunctive relief as allowed by law and required by justice, including, but not limited to, an order compelling DEFENDANTS to take specific actions to cleanup, remediate, and/or correct the PLUME." A.1705, ¶ 439; SPA.20-21.

The District Court held that the Greenpoint Complaints contained allegations both within and outside the scope of the ExxonMobil defense obligation. SPA.26. The District Court recognized that, under Illinois law, an indemnitor is required to provide a complete defense of the entire lawsuit in the event of a "mixed allegation" Complaint. SPA.24-25. However, the District Court held that this "mixed allegation" rule only applies to insurance companies issuing insurance policies. SPA.25-26. The District Court therefore ordered a trial for a jury to decide "the

14

reasonable amount of fees and costs BP had to expend in its defense against claims that should have been defended by ExxonMobil pursuant to the parties' 1993 Agreement and 2004 Agreement." SPA.34.

**J. The Trial Where the Jury Was to Determine Whether Attorneys' Fees Incurred by BP Were to Defend Covered Claims**

Evidence at trial centered on whether work performed by the attorneys defending BP in the 23 Greenpoint lawsuits were for personal injury and property damage claims, within the scope of the defense and indemnity, or to defend claims seeking BP to remediate contamination. *See, e.g.*, A.655-57, at 422:13-424:6; A.687-88, at 454:4-455:9. The District Court instructed the jury that it needed to determine which of the of attorneys' fees incurred by BP were to defend covered claims seeking compensatory damages for personal injuries and property damages:

> Prior to trial, I also found that ExxonMobil was obligated to reimburse BP to defend against all covered claims pursued by the Greenpoint Contamination Litigation plaintiffs, but not obligated to reimburse BP to defend against non-covered claims pursued in those cases. It will be for you to decide whether the claims…for which BP seeks attorneys' fees and costs from ExxonMobil were covered and/or non-covered claims. You may find, however, that there were instances where work that BP's attorneys performed could have been relevant to both a covered claim and a non-covered claim. In these instances, you should use your sound judgment in evaluating the nature of the work that BP's attorneys performed and whether it was for covered or non-covered claims, or how much of it was for covered or non-covered claims,

15

> drawing reasonable inferences where you deem
> appropriate from the facts and circumstances in evidence.

A.1408-09, at 1070:24-1072:10; A.1824.

The jury answered "No" to the following jury verdict sheet question:

> 1. Did Plaintiff BP Products North America Inc.
> ("Plaintiff") prove, by a preponderance of the evidence,
> that Defendant ExxonMobil Corporation ("Defendant")
> breached the 1993 Agreement, as modified, in effect, by
> the 2004 Agreement (pursuant to the Court's ruling)?

A.1831.

## SUMMARY OF ARGUMENT

Had the District Court followed applicable Illinois law governing the indemnity agreement at issue, there would have been no need for a trial. BP brought this lawsuit because ExxonMobil refused to honor a 1993 defense and indemnity agreement and provide BP with a defense to 23 third-party lawsuits. At summary judgment, the District Court found that the Complaints in these 23 lawsuits all contained claims that were within the scope of ExxonMobil's indemnity. Under Illinois law, the District Court should have found that ExxonMobil was therefore required to provide BP with a complete defense to each of the 23 lawsuits, even though the Complaints contained a few allegations outside the scope of the indemnity.

The District Court, however, held that the "complete defense" rule applies only to insurance policies, and not private indemnity contracts, and that ExxonMobil

16

needed to only provide a defense for covered claims. The District Court cited no authority holding that the complete defense rule only applies to insurance contracts. To the contrary, one of the Illinois law cases cited by the District Court in fact applied the complete defense rule to a private indemnity contract.

The District Court compounded its error by creating an entirely new procedure without any basis in Illinois law. The District Court ordered a trial for a jury to parse through nine years of time records of the BP attorneys defending those lawsuits to determine if work done by BP's attorneys were to defend claims within the scope of ExxonMobil's indemnity. In fact, Illinois law provides that the duty to defend is determined by the allegations of the Complaint at the inception of the lawsuit. Illinois law does not provide that a duty to defend is determined by a trier of fact subsequently reviewing time records of the attorneys who defended the lawsuit.

The failure to follow Illinois law was especially unjust given that plaintiffs in the 23 lawsuits sought over $1 billion in compensatory damages and punitive damages for personal injuries and property damages, all of which were claims the District Court ruled were covered under ExxonMobil's indemnity. In contrast, the Complaints contained a single allegation outside the scope of ExxonMobil's indemnity seeking "injunctive relief as allowed by law" which the plaintiffs never actually sought. The District Court sanctioned ExxonMobil's unreasonable delay and refusal to provide BP with a defense, and created a new procedure that will

17

incentivize private indemnitors to refuse to honor an indemnity and instead force a jury trial. Had the District Court followed the law, BP's summary judgment motion should have been granted in full.

The District Court further erred by failing to apply the "Market Approach" used by Illinois state and federal courts to judge the reasonableness of the attorneys' fees where an indemnitor like ExxonMobil refuses to honor a defense obligation. The District Court instead used a multi-factor test applicable to fee-shifting cases.

Under the Market Approach, BP's attorneys' fees should have been found to be presumptively reasonable. BP paid those fees in the regular course of business and BP's attorneys' fees were less than half of ExxonMobil's attorneys' fees to defend the very same lawsuits. And since ExxonMobil presented virtually no evidence on summary judgment to rebut the presumptive reasonableness of BP's attorneys' fees, BP's motion for summary judgment should have been granted, awarding those fees to BP.

<u>**ARGUMENT**</u>

**I.  THE DISTRICT COURT ERRED AT SUMMARY JUDGMENT IN RULING THAT EXXONMOBIL DID NOT HAVE A DUTY TO PROVIDE BP WITH A COMPLETE DEFENSE TO THE CIVIL LAWSUITS**

The Complaints in the 23 Greenpoint civil lawsuits all sought compensatory damages for personal injuries and property damages allegedly caused by petroleum that had migrated under their properties. *See* pp. 6-9, *supra.* As such, the District Court correctly found at summary judgment that these allegations were all squarely within ExxonMobil's defense and indemnity obligation. *See* pp. 14-15, *supra.*

However, the District Court erred in requiring a jury trial to review the time records of BP's attorneys defending those 23 lawsuits to determine whether legal work performed related to claims covered by ExxonMobil's indemnity. The District Court should have granted BP's summary judgment motion and held that ExxonMobil was obligated to provide BP with a complete defense in all of the lawsuits based upon the allegations of the Complaints.

The Second Circuit reviews a District Court's rulings at summary judgment on legal issues under *de novo* review. *Perry v. City of New York*, 78 F.4th 502, 529, n.23 (2d Cir. 2023); *see also Dupree v. Younger*, 598 U.S. 729, 735 (2023) (holding that legal issues decided at summary judgment merge into a litigation's final judgment and are reviewable on appeal).

**A.    A Duty to Defend Is Determined By the Allegations of the Complaint**

Illinois law, which governs the 1993 Agreement, provides that the duty to defend is triggered from the allegations of the Complaint, regardless of whether those allegations are later proven. *Keilman v. Sam's West, Inc.*, No. 17-C-3683, 2018 U.S. Dist. LEXIS 162717, at *10-11 (N.D. Ill. Sept. 24, 2018). Although this principle is often stated in the insurance context, Illinois courts also apply this principle to private indemnity contracts. For example, in *Fragman Construction Co. v. Preston Construction Co*., 274 N.E.2d 614 (Ill. App. Ct. 1971), the court considered an indemnity agreement that was part of a real estate purchase agreement. The court stated that the duty to defend arises "when the allegations in the complaint 'state facts which bring the case within, or potentially within, the coverage of the policy'…This rule is based upon the principle that the insurer's duty to defend is broader than its duty to pay." *Id.* at 616.

Similarly, in *Wilda v. JLG Industries, Inc.*, 470 F. Supp.3d 770 (N.D. Ill. 2020), the court found a duty to defend in the context of a private indemnity agreement and stated as follows:

> When the duty to defend arises from an indemnity agreement, the existence of that duty "is determined solely from the allegations of the complaint and the agreements."… "[R]egardless of the events at trial, as long as the allegations in the pleadings potentially exposed [JGL] to liability, [Illini Hi-Reach] was obligated to 'defend' [JGL]."

*Id.* at 787-88 (internal citation omitted). The court in *Utica Mutual Insurance Co. v. David Agency Insurance, Inc.*, 327 F. Supp. 2d 922 (N.D. Ill. 2004) discussed this principle in the context of an insurance policy and stated that an "insurer has an obligation to defend if any part of the underling lawsuit could require it to indemnify the insured, even if the complaint alleges several causes of action and only one of those may be covered." *Id.* at 927 (internal citation omitted).

Here, the District Court ordered a trial for a jury to review the time records of BP's attorneys to determine which tasks performed were within the scope of the ExxonMobil indemnity. *See* pp. 13-15, *supra.* Such an after-the-fact review is directly contrary to Illinois law, which required that ExxonMobil's defense obligation be determined solely based on the allegations of the 23 Complaints.

> **B.** **The District Court Erred by Sanctioning ExxonMobil's Unreasonable Delay, Which Is Not Permitted Under Illinois Law**

Defense obligations under Illinois law are decided at the beginning of a lawsuit and an indemnitor like ExxonMobil cannot simply refuse to honor a defense obligation when tendered. In *Utica Mutual Insurance Co. v. David Agency Insurance, Inc.*, 327 F. Supp. 2d 922, 927-28 (N.D. Ill. 2004), the court stated that under Illinois law "an insurer has two options when it believes that the liability from a claim against its insured will not be covered by its insurance policy: (1) defend the

lawsuit under a proper reservation of rights, or (2) secure a declaratory judgment about its obligations under the policy prior to trial."

That principle is also applicable to private indemnity agreements. An indemnitor that does not quickly move for a declaratory judgment waives its right to contest its duty to defend. In *Frain Camins & Swartchild v. Bank of America National Trust*, No 91-C-8165, 1994 U.S. Dist. LEXIS 5891 (N.D. Ill. May 3, 1994), the court found that private indemnitors under a Purchase Agreement waived affirmative defenses to their duty to defend a lawsuit when they failed to bring a declaratory judgment action 17 months after the defense was tendered, requiring the indemnitee to hire its own counsel. The *Frain* court cited to Illinois insurance law and stated as follows:

> An insurance company seeking to contest coverage has two other alternatives [to defending under a reservation of rights]. It can immediately seek a declaratory judgment of non-coverage or refuse to do anything at the risk of being found in breach of its duty to defend. [Private contractual indemnitors] Morgan and Capitol Lease pursued neither of these two alternatives.

*Id*. at *19, n. 5 (internal citation omitted).

In *Litterer v. United States*, 545 F. Supp. 3d 625, 640 (N.D. Ill. 2021), the court granted summary judgment against a private indemnitor who unduly delayed in responding to a request for a defense and then simply denied a defense obligation:

> If UMS were permitted to deny a defense without justification and then cite an after-the-fact investigation to

22

> justify its denial, it would undermine the duty to defend.
> Litigation has costs. The purpose of the indemnity
> provision here was for the City to avoid having to incur
> costs in suits arising from or related to UMS's work. That
> is why "parties contract to allocate expenses of defending
> lawsuits to one or the other".

*Id*. at 641 (internal citation omitted).

Here, ExxonMobil refused to provide BP with a defense when tendered at the beginning of the lawsuits in May 2006, forcing BP to pay for its own defense. *See* pp. 9-11, *supra*. Nor did ExxonMobil seek a declaratory judgment that it had no such obligation. The District Court erred by finding that there was no waiver due to ExxonMobil's February 7, 2007 reply letter. SPA.27-29. However, that letter was "For Settlement Purposes Only" and tried to force BP to change the scope of the indemnity in the 1993 Agreement. *See* p. 10, *supra*. ExxonMobil then continued to refuse to defend and, nearly two years after BP's request for a defense, the parties entered into Tolling Agreements in which ExxonMobil acknowledged that it "has at the present time declined BP's request for defense and indemnity." *See* p. 11, *supra*. BP was forced to assume its own defense and ended up spending approximately $4.4 million to defend these 23 lawsuits seeking over $1 billion. *See* pp. 11-12, *supra*.

The District Court should have granted BP's summary judgment motion without the need for a trial. ExxonMobil was not entitled to simply refuse BP's tender, require BP to pay for its own defense and then years later argue that it had no obligation to defend BP. Under Illinois law, a private indemnitor cannot delay, but

instead is required to provide a defense with a reservation of rights or bring a declaratory judgment action.

### C. Because the District Court Correctly Found that ExxonMobil's Defense Obligations Were Triggered By Claims in the 23 Lawsuits, ExxonMobil Should Have Been Required to Provide Complete Defenses to the Entire Lawsuits

Complaints that contain claims both within and outside the scope of an indemnity are called "mixed allegation" Complaints under Illinois law. *Sears, Roebuck v. Ins. Co. of N. Am.*, No 89-C-5795, 1900 U.S. Dist. LEXIS 10421, at *12 (N.D. Ill. Aug. 8, 1990). As long as a Complaint contains some allegations potentially within the scope of the indemnity, Illinois law requires the indemnitor to provide a defense to the entire Complaint. *Maneikis v. St. Paul Insurance Co. of Illinois*, 655 F.2d 818, 822 (7th Cir. 1981).

This "mixed allegation" principle has been applied to private indemnity agreements. In *Sears Roebuck v. Insurance Company of North America*, No 89-C-5795, 1900 U.S. Dist. LEXIS 10421, at *12-13 (N.D. Ill. Aug. 8, 1990), the manufacturer of bicycles, Huffy, indemnified Sears Roebuck for claims regarding manufacturing defects. The third-party Complaint at issue against Sears Roebuck alleged both an inherent defect in the bicycle (within the scope of the indemnity) and the negligent assembly of the bicycle by Sears (outside the scope of the indemnity). *Id.*, at *2-3. The *Sears Roebuck* court nevertheless held that Huffy was obligated to

provide a defense to the entire lawsuit since "[w]here there arises a complaint in which 'there appears to be a potential for coverage under the policy,' the insurer has an obligation to defend":

> In the event of a so-called mixed allegation complaint, "where there is doubt as to whether a theory of recovery within the policy coverage has been pleaded in the underlying complaint, the insurer must defend"[.] [citing *Solo Cup Co. v. Federal Insurance Co.*, 619 F.2d 1178, 1185 (7th Cir. 1980)] When "recovery in the underlying suit is premised upon several theories of liability, some of which are excluded from policy coverage, the insurer still is obligated to defend if even one theory falls within the policy's coverage". *Maneikis v. St. Paul Insurance Co. of Illinois*, 655 F.2d 818, 822 (7th Cir. 1981).

*Id*. at *12-13.

Here, the District Court acknowledged that *Sears Roebuck* involved "a non-insurer indemnitor," but nevertheless refused to apply this "mixed allegation" principle of Illinois law because "well-established insurance law doctrines do not neatly map onto non-insurance cases." SPA.23-24. The District Court further stated that the "concept of 'mixed allegation' complaints is borrowed from insurance law, and 'Illinois courts recognize that there is a fundamental difference between insurers and non-insurers.' *Wilda v. JLG Indus., Inc.*, 470 F. Supp. 3d 770, 787 (N.D. Ill. 2020)." *Id*.

The District Court did not cite to a single private indemnity case where a court held that the general rule about "mixed allegation" Complaints does not apply to

private indemnity contracts. Indeed, the very *Sears Roebuck* case cited by the District Court applied the "mixed allegation" rule in the context of a private indemnity. The *Wilda* case cited by the District Court did not at all involve a "mixed allegation" Complaint or the obligation to provide a complete defense.[4]

In concluding that insurance law principles did not apply to the ExxonMobil/BP private agreement, the District Court also misapprehended the holding of another private indemnity case, *Kmart Corporation v. Footstar, Inc.*, No. 09-CV-3607, 2012 WL 1080262 (N.D. Ill. Mar. 30, 2012), *aff'd in part, rev'd in part*, 777 F.3d 923 (7th Cir. 2015), which directly supports BP's position. SPA.25. There, Footstar operated the footwear departments at Kmart stores and agreed to defend and indemnify Kmart for third-party claims "arising out of [Footstar's] performance …under this Agreement." *Kmart Corp. v. Footstar, Inc*, 777 F.3d 923, 926 (7th Cir. 2015). A customer sued Kmart alleging an injury caused by a Footstar employee assisting the customer outside of the footwear department. While Footstar argued that its employee was acting outside the scope of the Footstar contract, the Seventh Circuit held that Footstar was required to provide Kmart with a defense

---

[4] In finding a duty to defend, the *Wilda* court found that its "analysis is straightforward" as the private indemnity agreement at issue covered "all losses for claims including 'strict liability or negligence' and Wilda sued JLG for strict liability and negligence.   So Illini Hi-Reach had a duty to defend JLG." *Wilda*, 470 F. Supp. 3d at 787.

26

since "[t]here is certainly an argument" that the injury arose from the work subject to the indemnity agreement. *Id.* at 931.

> The District Court interpreted *Kmart* as follows:

> [*Kmart*] found that the indemnitor would have to defend the indemnitee to the extent the suit's claim fell within the parties' agreement…That is exactly the result the Court reaches here. ExxonMobil did not and could not breach the 1993 Agreement by refusing to defend BP against claims that were beyond the scope of ExxonMobil's contractual duty.

SPA.25.

In fact, this is the exact opposite of the *Kmart* holding. The *Kmart* District Court used "to the extent" to mean that, if it is possible that the Complaint alleges a covered claim, a defense must be provided. *Kmart Corp. v. Footstar, Inc.*, No. 09-CV-3607, 2012 WL 1080262, at *15 (N.D. Ill. Mar. 30, 2012).

The District Court granted partial summary judgment to BP, finding that the 23 Complaints all alleged claims for compensatory damages within the scope of ExxonMobil's defense obligation:

> The *Baumbach* and *Spiroff* plaintiffs sought in excess of $1 billion for damages "arising out of or otherwise relating to environmental contamination associated with a [ ] portion of the Greenpoint Contamination [and] dissolved substances associated with the liquid plume which are not physically located under" the BP terminal. (1993 Agreement, Dkt. 36-4, § IV(C)). The Court therefore concludes that ExxonMobil, "confronted with allegations in a complaint that could give rise to liability under the

27

indemnity provision," did not have a good faith basis to refuse to defend BP against these claims.

SPA.21-22.

That should have been the end of the inquiry under the mixed allegation rule. Since the Greenpoint Complaints contained claims that as a matter of law were within the scope of ExxonMobil's defense obligation, ExxonMobil was required to provide a complete defense to the entire lawsuit.

Rather than ruling that ExxonMobil was obligated to provide BP with a complete defense to the 23 Greenpoint lawsuits, the District Court erred by ordering a trial for a jury to determine whether BP incurred fees (a) defending covered claims for compensatory damages or (b) defending claims where the plaintiffs sought to require BP to defend the single allegation in the Complaints seeking "injunctive relief as allowed by law."[5] SPA.34.

This type of after-the-fact inquiry has no basis in Illinois law, which provides that a defense obligation is determined from the allegations of the Complaint and

_____

[5] There was no evidence that the Plaintiffs in any of the 23 lawsuits actually sought injunctive relief. *See* A.585-86, Direct Examination of Vilia Drazdys, Witness for BP, at 352:23-353:12; *see also* A.1200-01, Cross-Examination of Michael Hall, Witness for ExxonMobil, at 894:24-895:3. Given that the Plaintiffs sought compensatory damages, they could not show irreparable harm as a matter of law. *See DiFabio v. Omnipoint Comms., Inc.*, 887 N.Y.S.2d 168, 66 A.D.3d 635, 636-37 (2d Dept. 2009). Moreover, such relief would have been superfluous since ExxonMobil had already entered into a Consent Order with NYSDEC requiring ExxonMobil to remediate all petroleum throughout Greenpoint. *See* A.1456.

that the "complete defense" rule applies to private indemnity agreements such as the

1993 Agreement.

> **D.    The District Court's Summary Judgment Ruling Relied Upon Differences Between the Law Governing Insurance Contracts and Private Indemnity Agreements That Have No Relevance to The Current Situation**

In declining to apply the complete defense rule that Illinois courts have

applied to private indemnity agreements, the District Court stated as follows:

> [T]he concept of "mixed allegation" complaints is borrowed from insurance law, and "Illinois courts recognize that there is a fundamental difference between insurers and non-insurers." *Wilda v. JLG Indus., Inc.*, 470 F. Supp.3d 770, 787 (N.D. Ill. 2020)…Non-insurers "simply do not have the same specialized experience of providing insurance as an actual insurance company," and "[t]he reason for imposing a heightened duty to defend on insurers – because they are professional sellers of insurance – is therefore not present in the non-insurance context." *Dominick's Finer Foods, LLC v. Eurest Servs., Inc.*, No. 1-15-369 (LCL), 2015 WL 6735491, at *3 (Ill. App. Ct. Nov. 2, 2015).

SPA.24.

None of these cited cases involved the defense of a Complaint with "mixed

allegations" or the "complete defense" rule.  *See* pp. 24-27, *supra*.  The distinction

in those cases between insurance contracts and private indemnity agreements

involved a very different situation that is not present here.

The "heightened duty" mentioned in *Dominick's Finer Foods* is that an

insurance company's duty to defend is based solely on the allegations of the

Complaint. *Dominick's Finer Foods, LLC v. Eurest Servs., Inc.*, No. 1-15-0369 (LCL), 2015 WL 6735491, at *7 (Ill. App. Ct. Nov. 2, 2015). In contrast, a private indemnitor can introduce facts to show that the allegations of a Complaint are mistaken and that there actually should be no coverage. For example, in the private indemnity case of *Ervin vs. Sears, Roebuck and Co.,* 469 N.E.2d 243 (Ill. App. Ct. 1984), an underwear manufacturer contracted to defend and indemnify Sears from third-party claims. The court looked beyond the Complaint to determine if the personal injury plaintiff had really been wearing the manufacturer's underwear. Distinguishing insurance cases from private indemnity situations, the court stated as follows:

> [W]hile the laws expressly prohibits those in the business of insurance from refusing to defend based on what they have discovered from "looking behind" the subject complaint, no such restriction is imposed on a business which, as part of its agreement with a purchaser of its products, agrees to defend and/or indemnify that customer in suits involving those products.

*Id.* at 249.

Similarly, in *Dominick's Finer Foods v. Eurest Servs., Inc.*, No. 1-15-369 (LCL), 2015 WL 6735491, at *2 (Ill. App. Ct. Nov. 2, 2015), a cleaning service contracted to defend and indemnify Dominick's Finer Food for acts arising out of its negligence. The Court looked at facts outside of the third-party Complaint to determine that the legal claim was not actually based upon the cleaning service's

30

negligence. The court held that private party cleaning service Eurest was obligated to provide a defense "to the extent that any Claims arise out of" Eurest's negligence, but that Dominick's and its store manager were sued for their own negligence which was, accordingly, outside of the indemnity. *Id.*, at *10.

The Court in *Wilda v. JLG Industries, Inc.* discussed that a private indemnitor could raise facts outside of the Complaint. *Wilda v. JLG Indus., Inc.*, 470 F. Supp. 3d 770, 787-88 (N.D. Ill. 2020). However, the *Wilda* Court found no need to do so since the allegations of the Complaint clearly fit within the private indemnity. *Id*., at 787-88.

Here, the District Court did not need to look beyond the allegations of the civil Complaints to determine that ExxonMobil's duty to defend was triggered by the clear allegations of the 23 Complaints. The District Court found that the parties "intended to allocate responsibility to ExxonMobil regardless of culpability" for all third-party claims seeking compensatory damages involving petroleum that was not under the BP terminal. SPA.12. That is exactly what was alleged in the 23 Complaints – that petroleum migrated under the plaintiffs' properties causing over $1 billion in personal injuries and property damages. *See* pp. 6-9, *supra*. ExxonMobil has also publicly acknowledged that the plume of petroleum extends far beyond the BP terminal. *See* A.1456, 1472, 1990 Mobil Order on Consent. The District Court therefore granted partial summary judgment to BP, finding that the

31

Complaints contained allegations within the scope of the 1993 defense and indemnity agreement. *See* pp. 13-15, *supra*.

The "heightened duty" mentioned by the District Court has nothing to do with the "compete defense" rule for "mixed allegation" Complaints. The District Court erred by failing to apply well-settled Illinois law that ExxonMobil was required to provide BP with a complete defense to all 23 of the Greenpoint lawsuits.

### E. The District Court's Summary Judgment Ruling Creates an Incentive For an Indemnitor to Deny Its Defense Obligation

The logic of the District Court's summary judgment decision is completely contrary to Illinois law which provides that the duty to defend is determined from the allegations of a third-party Complaint at the outset of the lawsuit and that the complete defense rule is applicable to private indemnity situations. *See* pp. 20-21, *supra*.

The jury trial ordered by the District Court did not involve the issue of whether the 23 Greenpoint Complaints contained allegations within the scope of the 1993 Agreement. Instead, the District Court left it to the jury to parse through thousands of pages of BP's attorney time records to determine how much time was incurred to defend the covered claims seeking money damages.[6]

---

[6] This was clearly a confusing task for the jury. Indeed, there was unrebutted testimony that BP attorneys spent a large amount of time on tasks related to defending personal injury and property damage claims, yet the jury answered the verdict question that ExxonMobil had not breached its obligation under the 1993 Agreement. *See, e.g.*, A.684-85, at 451:16-452:13; A.687-88, at 454:20-455:9; A.1831.

The District Court's Decision created a new standard under Illinois law for a private party indemnity. A private indemnitor is now incentivized to refuse to honor a defense obligation, require the indemnitee to hire counsel for the duration of a lawsuit, and force the indemnitee to have a jury trial to review time records of the indemnitee's counsel to determine whether work performed by that counsel was for covered claims. That procedure created by the District Court is contrary to the requirements of Illinois law, bargained for by the parties as part of the 1993 Agreement, that a defense obligation is determined based on the allegations of a Complaint at the beginning of a lawsuit.

## II. THE DISTRICT COURT ERRED REGARDING THE APPLICABLE LEGAL STANDARD FOR DETERMINING THE REASONABLENESS OF ATTORNEYS' FEES SOUGHT BY BP

The District Court erred at summary judgment and again in an *in limine* ruling by applying the incorrect standard to judge the reasonableness of BP's legal fees. The District Court did not apply the "Market Approach" standard used by both Illinois courts and federal courts to judge the reasonableness of fees already incurred by an indemnitee when an indemnitor wrongfully refuses to honor a defense obligation.

Instead, the District Court used a multi-factor "lodestar" type of approach applied by courts to award legal fees under a fee-shifting statute or a similar contractual provision. Had the District Court applied the correct Market Approach,

BP's fees would have been found to be presumptively reasonable and summary judgment should have been granted awarding those fees to BP, without the need for a trial.

Challenges regarding errors of law concerning contractual fee awards are reviewed *de novo* in the Second Circuit. *CARCO Grp., Inc. v. Maconachy*, 718 F.3d 72, 79-80 (2d Cir. 2013); *see also Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 198-99 (2d Cir. 2003).

## A. The "Market Approach" To Determining the Reasonableness of Legal Fees Incurred

Illinois law governs the parties' 1993 Agreement. While the "Market Approach" to determine the reasonableness of attorneys' fees is used by Illinois state courts, *see* pp. 37-39, *infra*, it was first articulated by Seventh Circuit courts to assess the reasonableness of fees incurred by an indemnitee. Unlike a "lodestar" analysis, the Market Approach does not permit an after-the-fact analysis of legal fees. An indemnitee's fees are instead presumed reasonable if those fees were paid by a client in the normal course of business when recovery of those fees was uncertain.

In *Balcor Real Estate Holdings v. Walentas-Phoenix Corp.*, 73 F.3d 150 (7th Cir. 1999), the Seventh Circuit upheld summary judgment awarding defense costs paid by the plaintiff and stated as follows:

> [T]he best evidence of the market value of legal services is what people pay for it. Indeed, this is not "evidence" about market value; it *is* market value. … Although

34

> Walentas denies that Balcor got its money's worth, it does not deny that these were real bills that Balcor paid and it does not argue that Balcor's lawyers ran the meter because they thought that Walentas would have to cover the tab. Corporate inside counsel monitor bills submitted by outside counsel; nothing in this record suggests that these bills received less than the usual review. They were deemed commercially reasonable and paid.

*Id.*, at 153 (emphasis in original).

If a plaintiff paid its legal fees at a time when recovery from an indemnitor was uncertain, that is additional evidence that the fees were reasonable. In *Great West Casualty Co. v. Marathon Oil Co.*, No. 99-C-3101, 2003 U.S. Dist. LEXIS 2721, at *20 (N.D. Ill. Feb. 25, 2003), the Court stated that "the best indication of whether an attorneys' bills are reasonable is whether they are paid, especially in a situation such as this, where Marathon agreed to pay without any reassurance that it would be reimbursed by Great West." Likewise, in *Taco Bell Corp. v. Continental Casualty Co., et al.*, 388 F. 3d 1069, 1075-76 (7th Cir. 2004), the Seventh Circuit stated as follows:

> Because of the resulting uncertainty about reimbursement [due to the defendant's failure to provide a defense] Taco Bell had an incentive to minimize its legal expenses (for it might not be able to shift them); and where there are market incentives to economize, there is no occasion for a painstaking judicial review.

In addition, where legal fees incurred by an indemnitee are less than fees incurred by another party to the lawsuit, courts applying the Market Approach view

that as further evidence that the indemnitee's fees were reasonable. In *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 200 F.3d 518, at 521 (7th Cir. 1999), the Seventh Circuit rejected the indemnitor's request to conduct a line-by-line review of the legal fee invoices, finding in part that "[o]ne indicator of reasonableness is that [plaintiff] paid all of these bills at a time when its ultimate recovery was uncertain," and another was that "[plaintiff's] total legal fees and expenses came to about $200,000 less than [defendant's]," which implied that plaintiff "engaged in prudent cost control and therefore is entitled to full indemnity."

New York federal courts also apply the Market Approach. In *Value Wholesale, Inc. v. KB Insurance Co, Ltd.*, No. 18-cv-5887, 2020 WL 6393016 (E.D.N.Y Nov. 2, 2020), in applying the Market Approach, the court distinguished a fee-shifting lodestar situation and stated that "[w]here an insurer has breached its duty to defend, the insured's fees are presumed to be reasonable and the burden shifts to the insurer to establish that the fees are unreasonable." *Id.* at *5.

Here, the District Court correctly found that the 23 Complaints contained allegations within the scope of ExxonMobil's indemnity obligation. *See* pp. 13-15, *supra*. Yet ExxonMobil did not honor its defense obligation, forcing BP to incur legal fees to defend those lawsuits. The fees incurred by BP should have been presumed to be reasonable.

36

**B. Illinois State Courts Also Apply the Market Approach When Judging the Reasonableness of Defense Costs**

Illinois state courts similarly apply the Market Approach when judging the reasonableness of attorneys' fees incurred by an indemnitee when an indemnitor wrongfully refuses to honor its duty to defend. In *American Service Insurance Co. v. China Ocean Shipping Co. (Americas) Inc. et al.*, 932 N.E.2d 8 (Ill. App. Ct. 2010), an insurance company brought a declaratory judgment asserting that it had no duty to provide a defense to an insured. The insured, in turn, sought an award of legal fees it was forced to incur as a result of the insurer's refusal to provide a defense. In awarding all of the insurer's fees without an evidentiary hearing, the trial court held that "there is no dispute that the bills have been paid" and that this was "a *prima facie* showing of reasonableness." *Id*. at 23-24.

The Illinois appellate court affirmed and, citing the Seventh Circuit's *Taco Bell* decision, stated as follows:

> In *Taco Bell*, the insurer, having been found to have a duty to defend, argued that the insured overpaid the lawyers that represented it in the underlying litigation. Judge Posner noted:
>
> "When Taco Bell hired its lawyers, and indeed at all times since, Zurich [has] vigorously den[ied] that it had any duty to defend – any duty, therefore to reimburse Taco Bell. Because of the resulting uncertainty about reimbursement Taco Bell had an incentive to minimize its legal expenses (for it might not be able to shift them); and where there are market incentives to economize, there is no occasion for a

37

> painstaking judicial review." *Taco Bell*, 388 F.3d at 1075-76.

*Id.*

Four years later, the Illinois appellate court in the same case again approved of the Market Approach to judge the reasonableness of legal fees that an insured sought to recover.   In *American Service Insurance Co. v. China Ocean Shipping Co. (Americas) Inc.*, 7 N.E.3d 161 (Ill. App. Ct. 2014), the court affirmed the trial court's grant of summary judgment on reasonableness of fees without an evidentiary hearing and stated:

> Moreover, we agree with the approach taken by the court in *Taco Bell* and followed by this court and the circuit court in the prior proceedings, which treats the attorney fees paid by the insured as presumptively reasonable in this context, because an insured has a financial incentive to ensure that the attorney fees it pays are reasonable when it is uncertain whether those fees will be reimbursed by the insurer.

*Id.* at 173; *see also Creative Vistas, Inc. v. Kolin*, Nos. 1-16-1772, 1-16-1883, 2017 WL 4125631, at *3 (Ill. App. Ct. Sept. 13, 2017) ("[I]t is undisputed that Kolin already paid its attorneys some $88,000 in legal fees, which serves as prima facie evidence of the reasonableness of the fees. *See American Service Insurance Co. v. China Ocean Shipping Co.*, 402 Ill. App. 3d 513, 529-30 (2010)").

Here, a Market Approach analysis should have been applied at summary judgment.   After ExxonMobil refused to honor its defense obligation, BP was forced

for nine years to pay for its own defense of 23 lawsuits seeking in excess of $1 billion, plus punitive damages, all as a result of the historical plume of petroleum attributable to spills at a former Mobil refinery.

BP paid the fees of its counsel on a monthly basis until the lawsuits were resolved. A.65, ¶¶ 19-20. BP negotiated fee discounts with its outside counsel and then carefully reviewed outside counsel invoices before paying them. *Id.*, ¶¶ 18-19. The fees charged by BP's outside counsel were less than half charged by ExxonMobil's counsel to defend the very same lawsuits and the hourly rates charged by BP's outside counsel were equal to or less than the rates charged by ExxonMobil's outside counsel. A.67-68, ¶ 24.

Accordingly, the legal fees incurred by BP were presumptively reasonable. At summary judgment, ExxonMobil only identified a single time entry of BP's counsel fees that it claimed was improper – a February 19, 2007 time entry for 0.2 hours with a value of $105. *See* ExxonMobil Corp. Motion In Opposition to BP's Motion for Summary Judgment, at ECF 20-21 (Dist. Ct. Dkt. 36-15); A.42. Accordingly, ExxonMobil submitted no evidence at summary judgment why the remaining $4,445,802.19 in fees incurred by BP were not reasonable and summary judgment should have been granted awarding BP all of those fees.

**C. The District Court Erred by Applying An**
   **Incorrect Standard of Review**

At summary judgment, the District Court did not rule on BP's motion that the "Market Approach" applied to assessing the reasonableness of legal fees that it incurred. SPA.30-31. BP raised this issue again at the *in limine* stage and the District Court held that the Market Approach was federal law, but not Illinois law. A.396-400, at 149:2-153:11.

The District Court instead ruled that that the jury should review legal fees incurred by BP pursuant to eight factors: (1) the skill and standing of the attorneys who performed the work; (2) the nature of the lawsuits; (3) the novelty or difficulty of the issues and work involved; (4) the importance of the lawsuits to BP; (5) the degree of responsibility required to defend the lawsuits; (6) the usual and customary charges for comparable services: (7) the benefit to BP; and (8) whether there was a connection between the fees and the amounts involved in the lawsuits. A.400, at 153:2-11; A.1827-28.

In support of this ruling, the District Court cited two Illinois cases that did not involve an indemnitee seeking to recover legal fees incurred when an indemnitor wrongfully refused to honor its defense obligation. *See* A.400-01, at 153:8-154:14. Those cases, *McHenry Sav. Bank v. Autoworks of Waucanda, Inc.*, 924 N.E.2d 1197 (Ill. App. Ct. 2010) and *Kaiser v. MEPC American Properties, Inc.*, 518 N.E.2d 424 (Ill. App. Ct. 1987), both involved contractual provisions for the recovery of fees in

the event of a successful litigation, as opposed to a defense situation where an indemnitee was entitled to a full defense without any contingencies.

The District Court should have granted BP's summary judgment motion that its fees were reasonable under the Market Approach. Since ExxonMobil presented virtually no evidence at summary judgment to overcome the presumption of reasonableness, there was no need for a jury trial on this issue.

## CONCLUSION

For the foregoing reasons, the District Court's summary judgment ruling should be reversed and summary judgment should be awarded in favor of BP.

Dated:  New York, New York
        February 11, 2025

Respectfully submitted,

*/s/ Jonathan K. Cooperman*
Jonathan K. Cooperman
Luis Peña-Navarro
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.:  212-808-7800
Email:
Jcooperman@kelleydrye.com
Lpena-navarro@kelleydrye.com

*Attorneys for Plaintiff BP Products North America Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of this brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 9,523 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

Dated:  New York, New York
          February 11, 2025

*/s/ Jonathan K. Cooperman*
Jonathan K. Cooperman
Luis Peña-Navarro
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.:  212-808-7800
Email:
Jcooperman@kelleydrye.com
Lpena-navarro@kelleydrye.com

*Attorneys for Plaintiff BP Products*
*North America Inc.*

42

# SPECIAL APPENDIX

i

# TABLE OF CONTENTS

**Page**

So-Ordered Memorandum & Order of the
Honorable Pamela K. Chen, dated and filed on
September 28, 2022, Appealed From ....................  SPA-1

Judgment, dated and filed on October 19, 2023,
Appealed From ......................................  SPA-35

So-Ordered Memorandum & Order of the
Honorable Pamela K. Chen, dated and filed on
September 30, 2024, Appealed From ....................  SPA-36

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
BP PRODUCTS NORTH AMERICA INC.,

                    Plaintiff,

          - against -

EXXONMOBIL CORPORATION,

                    Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-3288 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

      This case arises out of a long-running dispute between Plaintiff BP Products North America Inc. ("BP") and Defendant ExxonMobil Corporation ("ExxonMobil") regarding liability for, and remediation of, an oil spill contamination in Greenpoint, a mixed-use neighborhood in Brooklyn, New York. The contamination was identified by the United States Coast Guard back in 1978. Over forty years later, BP and ExxonMobil still dispute responsibility for the contamination and remediation, while the residents and businesses in Greenpoint continue to suffer harm from the oil spill, with no remediation in sight. The present iteration of the parties' disagreement is far removed from addressing the contamination itself: the parties dispute responsibility for approximately $4.4 million in fees and costs incurred by BP in defending itself against certain third-party actions brought by Greenpoint residents and businesses. Currently before the Court are parties' cross-motions for summary judgment. For the reasons stated herein, the parties' cross-motions are granted in part and denied in part.

1

## BACKGROUND

The following facts, taken from the parties' Local Civil Rule 56.1 statements[1] and relevant parts of the summary judgment record, are undisputed unless otherwise noted.

### I.    History of the Parties' Relationship

#### A.    The BP Terminal

Prior to 1968, ExxonMobil's predecessor, Mobil Oil Corporation ("Mobil"), owned and operated a petroleum refinery facility on its property in Greenpoint, Brooklyn.  (Plaintiff's Rule 56.1 Statement ("Pl. 56.1"), Dkt. 37-2, ¶¶ 1–3.)  In 1968, BP's predecessor, Amoco Oil Company ("Amoco"), together with Cities Service Oil Company ("Citgo"), purchased "an approximately 10[-]acre parcel" of Mobil's Greenpoint property located "by Apollo Street and Norman Avenue" (the "BP Terminal").  (Id. ¶ 5.)  Mobil retained part "of the refinery property which it used as a petroleum bulk storage and distribution terminal" (the "ExxonMobil Terminal").  (Id. ¶ 4.)  In 1970, Amoco purchased Citgo's interest and became the sole owner of the BP Terminal, which it used "as a storage and distribution" facility "for retail petroleum products."  (Id. ¶ 5.)

In 1978, the Coast Guard, upon observing "a concentration of oil on Newtown Creek and determin[ing] that it was seeping from the bulkhead by Meeker Avenue," "retained an environmental consulting firm, Geraghty & Miller, Inc. [('G&M')], to investigate the nature and extent of sub-surface oil products in the area."  (Id. ¶ 6.)  In July 1979, G&M issued a report of its findings (the "G&M Report"), in which it found environmental contamination in Greenpoint (the

---

[1] Pursuant to Local Civil Rule 56.1(d), "[e]ach statement by the movant or opponent pursuant to [a summary judgment motion], including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  To the extent "the record does not support certain critical assertions" in the parties' 56.1 statements, the Court has disregarded those unsupported assertions. *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003).

"Greenpoint Contamination") and that the BP Terminal was "not the source of the spill . . . and does not handle the type of product found in the subsurface." (*Id.* ¶ 9; G&M Report, Dkt. 37-4, Executive Summary ¶ 22.)  The G&M Report further found that a "former Mobil refinery shut down in 1965 and demolished in 1968 occupied the present Amoco [*i.e.*, the BP Terminal] site and adjacent properties" and, "[b]ased on the physical characteristics of the spill, age of the product, and its chemical characteristics," G&M "concluded that the source of the product is the former Mobil refinery."  (Pl. 56.1, Dkt. 37-2, ¶ 9; G&M Report, Dkt. 37-4, Executive Summary ¶¶ 24, 27.)

### B.    The Parties' 1993 and 2004 Settlement Agreements

In the aftermath of G&M's findings regarding the Greenpoint Contamination, Amoco and Mobil disputed responsibility regarding the Greenpoint Contamination and, to resolve this dispute, entered into a settlement agreement in May 1993 (the "1993 Agreement").  (Pl. 56.1, Dkt. 37-2, ¶ 13.)  Under the 1993 Agreement, Amoco and Mobil agreed to "resolve all existing disagreements over responsibility and allocate liability for environmental contamination (including, among other things, third party personal injury and property damage claims)" in connection with, among other things, the Greenpoint Contamination.[2]  (1993 Agreement, Dkt. 36-4, at 2.)

Pursuant to the 1993 Agreement, Amoco paid $1 million to Mobil in exchange for Mobil's (1) waiver and release of Amoco "from any and all claims that Mobil has or may in the future have against Amoco relating in any way to environmental contamination associated with the Greenpoint Contamination or any other dissolved substances associated with the liquid plume which are not physically located under" the BP Terminal (1993 Agreement, Dkt. 36-4, § IV(A)–(B)); and (2)

---

[2] The 1993 Agreement "also resolved unrelated issues between the two companies concerning sites in Illinois and in New England."  (Pl. 56.1, Dkt. 37-2, ¶ 13.)

agreement "to defend, indemnify, and hold harmless Amoco . . . from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including any attorney's fees) asserted by governmental or nongovernmental plaintiffs, complainants, or claimants, arising out of or otherwise relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume which are not physically located under" the BP Terminal (*id.* § IV(C)). The 1993 Agreement is binding upon BP and ExxonMobil as "the successors and assigns" of Amoco and Mobil, respectively. (*See* Pl. 56.1, Dkt. 37-2, ¶ 18.)

Following the parties' entry into the 1993 Agreement, Amoco concluded "that sub-surface petroleum products attributable to the Mobil plume were continuing to migrate through the sub-surface under the" BP Terminal. (*Id.* ¶ 19.) Thus, in 1999, "Amoco brought a lawsuit in Illinois federal court seeking a declaratory judgment and damages for breach of the 1993 Agreement" against Mobil, which, in turn, asserted a counterclaim for breach of the 1993 Agreement (the "1999 Action"). (*Id.* ¶ 20; Defendant's Rule 56.1 Statement ("Def. 56.1"), Dkt. 36-1, ¶ 4.) Mobil removed the action to this District. (Pl. 56.1, Dkt. 37-2, ¶ 20; *see Amoco Oil Co. v. Mobil Oil Co.*, No. 00-CV-2228 (SJF) (JXA) (E.D.N.Y. Apr. 14, 2000).)

In February 2004, BP, as the successor to Amoco, and ExxonMobil, previously known as Mobil, entered into a settlement agreement to resolve the 1999 Action (the "2004 Agreement"). (Pl. 56.1, Dkt. 37-2, ¶ 21.) Under the 2004 Agreement, the parties each agreed to "maintain hydraulic control" on the southern and western boundaries of the BP Terminal, respectively, "to prevent petroleum products 'from migrating in the future'" to and from the BP Terminal. (*Id.* ¶¶ 21–22.) The 2004 Agreement also contained mutual releases. In relevant part, BP "remise[d], release[d], and forever discharge[d]" ExxonMobil "of and from any and all manner of action and

4

cause of action, . . . claims and demands whatsoever, . . . whether known or unknown, which against [ExxonMobil], [BP] ever had or now have relating to (1) the claims made in the [1999 Action], including without limitation, claims relating to the alleged migration of Products onto BP's Property, and (2) responsibility for remediating contamination at the Greenpoint Area[3].]" (2004 Agreement, Dkt. 36-5, § 6(b); Def. 56.1, Dkt. 36-1, ¶ 6; Defendant's Opposition to Plaintiff's Rule 56.1 Statement ("Def. 56.1 Opp."), Dkt. 36-16, ¶ 23.) The 2004 Agreement also provided that, "[e]xcept where amended by this Agreement, the 1993 Agreement shall remain in full force and effect." (2004 Agreement, Dkt. 36-5, § 8; Def. 56.1, Dkt. 36-1, ¶ 7.)

## II.    The Greenpoint Contamination Litigation

### A.    The *Baumbach* and *Spiroff* Actions

In October 2005 and April 2006, groups of Greenpoint, Brooklyn residents, property owners, and occupants brought lawsuits against, among others, ExxonMobil and BP for "negligent, willful, and/or wanton actions" that caused the spill of "millions of gallons of oil and oil products . . . into the ground" and for failure "to remove the contamination which migrated and continues to migrate onto plaintiffs' properties causing plaintiffs to suffer ongoing injury and damages to their persons and properties." (*Baumbach et al. v. ExxonMobil et al.* (the "*Baumbach* Action") Fifth Amended Complaint ("Baumbach Fifth Am. Cmpl."), Dkt. 36-6, ¶¶ 1–2; Pl. 56.1, Dkt. 37-2, ¶ 25; Def. 56.1, Dkt. 36-1, ¶ 8; *Spiroff v. ExxonMobil Corp. et al.* (the "*Spiroff* Action"[4]

---

[3] The 2004 Agreement defines the "Greenpoint Area" as including the BP Terminal, the Mobil Terminal, "the areas where ExxonMobil formerly had its refinery operations, Newtown Creek, and areas adjacent to these areas where ExxonMobil is performing or may in the future perform remediation work." (2004 Agreement, Dkt. 36-5, § 1.1.)

[4] The *Spiroff* Action is one of "[t]wenty-two other lawsuits on behalf of over 300 Plaintiffs" that were "brought by the then New York law firm of Napoli Bern Ripka in New York State Supreme Court, Kings County against" ExxonMobil, BP, "and other companies (collectively, the 'Napoli lawsuits')." (Pl. 56.1, Dkt. 37-2, ¶ 30.) "The Napoli lawsuits all contained allegations similar to" the *Baumbach* Action. (*Id.*) Just like the *Baumbach* Action, the Napoli lawsuits "relied

and, together with the *Baumbach* Action, the "Greenpoint Contamination Litigation"), Fifth Amended Complaint ("Spiroff Fifth Am. Cmpl."), Dkt. 35-7, ¶¶ 1–2; Def. 56.1, Dkt. 36-1, ¶ 9.)[5]

The plaintiffs in the Greenpoint Contamination Litigation relied on the 1979 G&M Report in alleging that (1) the Greenpoint Contamination resulted in millions of gallons of plume of oil and oil products ("Plume"), (2) "the spill likely migrated and would continue to migrate with groundwater and by following underground conduits," and (3) "the majority of the spill most likely originated either at" the ExxonMobil Terminal or BP Terminal. (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 411–13; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 41–43.) The complaints further alleged that, "[i]n the decade that followed the 1979 [G&M Report]," BP and ExxonMobil took "little action, if any, . . . to eliminate, correct, and or remedy the [Plume] or prevent its continued migration," which resulted in permanent and continuing harm to the plaintiffs. (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 416–22; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 46–58.) The plaintiffs sought costs for medical and property injuries, and injunctive relief for remediation. (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 437–39; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 77–79.)

---

upon the [G&M] Report regarding the source of contamination in Greenpoint," and "cited to the [G&M] Report's findings" regarding the extent of the oil spill and the conclusion that the spill "'most likely originated' at the" ExxonMobil Terminal and BP Terminal." (*Id.*) Accordingly, given the similarities between the lawsuits and the parties' focus on the *Spiroff* Action among the Napoli lawsuits, the Court's discussion of the *Spiroff* Action throughout this Memorandum and Order, unless otherwise indicated, encompasses the Napoli lawsuits.

[5] The Court derives the facts regarding the *Baumbach* and *Spiroff* Actions from the fifth amended complaints in those actions, filed by ExxonMobil in support of its motion for summary judgment. *See Taub v. Schon*, 51 N.Y.S. 3d 132, 133 (App. Div. 2017) ("The amended complaint takes the place of the original pleading" and "therefore become[s] the operative complaint." (internal quotation marks and citations omitted).) Moreover, although BP attaches the earlier complaints from each action to its motion for summary judgment (*see* Dkts. 37-9, 37-12), BP does not dispute ExxonMobil's reliance on the amended complaints and itself cites to the fifth amended complaint in the *Baumbach* Action in its responsive papers. (*See* Plaintiff's Opposition to Defendant's Rule 56.1 Statement ("Pl. 56.1 Opp."), Dkt. 38-1, ¶¶ 8, 10; Plaintiff's Reply in Support of Its Motion to Dismiss ("Pl. Reply"), Dkt. 39, at 1–2.)

**B.     Disagreement Regarding ExxonMobil's Duty to Defend and Indemnify BP**

On May 19, 2006, BP sent a letter to ExxonMobil asking ExxonMobil, pursuant to the 1993 Agreement, to defend and indemnify BP against the Greenpoint Contamination Litigation. (*See* BP's May 19, 2006 Letter, Dkts. 36-8, 37-14, at 1–3.)  In a letter dated February 7, 2007, ExxonMobil responded that the 2004 Agreement "modified" its "indemnity obligation relating to Greenpoint in certain respects," and, more specifically, that BP "expressly released" ExxonMobil from any and all claims relating to "responsibility for remediating contamination at the Greenpoint Area."  (*See* ExxonMobil's Feb. 7, 2007 Letter, Dkts. 36-9, 37-15, at 1.)[6]  Referring to the Greenpoint Contamination Litigation as "toxic tort lawsuits," ExxonMobil stated that it was "willing to assume BP's defense and indemnify BP, subject to [certain] terms and conditions." (*Id.* at 2.)  By letter dated March 7, 2007, BP refused to accept ExxonMobil's proposal due to the terms and conditions demanded by ExxonMobil.  (*See* BP's Mar. 7, 2007 Letter, Dkt. 36-10, at 4.)

In light of their disagreement regarding whether ExxonMobil had to defend and indemnify BP against the Greenpoint Contamination Litigation, the parties agreed to toll their claims "for failure to maintain hydraulic control pursuant to the 2004 Agreement and for reimbursement of defense costs, respectively."  (Def. 56.1, Dkt. 36-1, ¶ 15.)  In 2011 and 2013, ExxonMobil "negotiated a settlement of all claims in the Spiroff and Baumbach Actions, respectively" and "[i]n each settlement, ExxonMobil secured a full release and discharge of all claims against both ExxonMobil and BP in exchange for material payments made solely by ExxonMobil."  (*Id.* at 16.)

---

[6] ExxonMobil asserted that the claims advanced in two actions that do not fall under the Greenpoint Contamination Litigation discussed herein—*Riverkeeper, Inc. et al. v. ExxonMobil Mobil Corp.* and *Markowitz et al. v. ExxonMobil Corp.*—in which ExxonMobil sought to implead BP, were "covered by the release in the 2004 Agreement" because they sought injunctive relief "requiring additional remediation relating to the Greenpoint [C]ontamination" and ExxonMobil therefore "owe[d] no obligation to indemnify BP" in those actions.  (ExxonMobil's Feb. 7, 2007 Letter, Dkts. 36-9, 37-14, at 2; Pl. 56-1, Dkt. 37-2, ¶ 37; Def. 56.1 Opp., Dkt. 36-16, ¶ 37.)

### III.    The Present Action

On June 3, 2019, BP filed a complaint against ExxonMobil alleging that ExxonMobil breached the 1993 Agreement and seeking (1) payment of costs and expenses it accrued in defending the Greenpoint Contamination Litigation and (2) a declaration that ExxonMobil has a duty to reimburse BP.  (*See* Complaint, Dkt. 1, ¶¶ 27–34, 43–53.)  The parties filed their cross-motions for summary judgment on April 9, 2021.  (*See* Dkts. 36, 37, 38, 39.)[7]

### STANDARD OF REVIEW

Summary judgment is appropriate only where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);  *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).  "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'"  *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact . . . ."  *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019).  Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of material fact that must be resolved at trial.  *See Spinelli v. City of*

---

[7] BP's request for oral argument (Dkt. 21) is denied as unnecessary.

*New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013) (quoting *Anderson*, 477 U.S. at 252). That is, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"[A]t the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . ." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021). It must "consider the record in the light most favorable to the non-movant" and "resolve all ambiguities and draw all factual inferences in favor of the non-movant 'if there is a "genuine" dispute as to those facts.'" *Loreley*, 13 F.4th at 259 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "[T]he district court may not properly consider the record in piecemeal fashion; rather, it must 'review all of the evidence in the record.'" *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000)).

"The same standard of review applies when the court is faced with [a] cross-motion[] for summary judgment." *Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (internal quotation marks omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

### DISCUSSION

**I.    ExxonMobil's Duty to Defend BP Pursuant to Parties' Agreements**

**A.    The "Defend and Indemnify" Clause in the 1993 Agreement**

Under Illinois law, which governs the 1993 Agreement,[8] an agreement to defend and indemnify "is a contract and is subject to contract interpretation rules." *Buenz v. Frontline Transp. Co.*, 882 N.E.2d 525, 528 (Ill. 2008). Illinois courts look to the language of the contract to determine the parties' intent in executing it. *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) ("[A]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." (quoting *Western Ill. Oil Co. v. Thompson*, 186 N.E.2d 285 (Ill. 1962))). "Where the contract language is unambiguous, it should be given its plain and ordinary meaning." *Buenz*, 882 N.E.2d at 529.

"Indemnity contracts are to be strictly construed, and any ambiguity in the agreement is to be construed most strongly against the indemnitee . . . ." *Kmart Corp. v. Footstar, Inc.*, 777 F.3d 923, 928 (7th Cir. 2015) (brackets omitted) (quoting *Blackshare v. Banfield*, 857 N.E.2d 743, 746 (Ill. 2006)). Thus, "an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract . . . or such intention is expressed in unequivocal terms." *Buenz*, 882 N.E.2d at 529. "Illinois courts construe contractual clauses seeking partial indemnity as clauses seeking

---

[8] The parties generally agree that Illinois law governs the 1993 agreement, but dispute whether Illinois law or federal law governs the Court's consideration of the reasonableness of fees and costs sought by BP pursuant to the 1993 Agreement. As discussed below, *see supra* n.16, the Court does not need to reach that issue here.

contribution." *FHP Tectonics Corp. v. NES Rentals Holdings, Inc.*, No. 1-14-1650 (EOB), 2016 WL 3387306, at *12 (Ill. App. Ct. Jun. 17, 2016).[9]  "Contribution differs from indemnity in that indemnity shifts an entire loss from one tortfeasor to another, whereas contribution distributes a loss among tortfeasors by requiring each to pay his proportionate share." *Id.*

The "phrase 'any and all' alone [does] not determine whether a contra[]ct provides indemnification for an indemnitee's own negligence, but rather the phrase must be considered in the context of the entire contract." *Gen. Cas. Co. of Ill. v. Prof'l Mfrs. Reps., Inc.*, Nos. 2-10-385, 2-10-386, 2-10-387 (JJB), 2011 WL 10109741, at *8 (Ill. App. Ct. May 25, 2011) (citing *Buenz*, 882 N.E.2d at 529).  Illinois courts thus look to the entire contract to determine if it contains "any limiting language suggesting that the indemnity provision was not meant to cover claims resulting from" the indemnitee's own negligence. *Id.* at *9.  "[T]he focus on liability from the indemnitee's conduct is what often distinguishes cases in which the indemnitor was found liable for only its own negligence from cases where the indemnitor was also found liable for the indemnitee's negligence." *Id.* at *11.  "If the contract warrants it[,] . . . the use of the phrase 'any and all' may indicate . . . that the parties intended an indemnitee be indemnified, even for the indemnitee's own negligence." *Buenz*, 882 N.E.2d at 533.

Here, the 1993 Agreement provides that:

> Mobil and its Affiliates hereby agree to defend, indemnify, and hold harmless Amoco and its Affiliates from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including attorney's fees), asserted by governmental or nongovernmental plaintiffs, complainants, or claimants, arising out of or otherwise relating in any way to environmental contamination associated with any portion of the Greenpoint

---

[9] While Illinois Supreme Court Rule 23(e) provides "that *parties* may *not* cite to nonprecedential orders except for limited purposes," "nothing in the language of [the rule] prevents a court from doing so." *Crystal Lake Ltd. P'ship v. Baird & Warner Residential Sales, Inc.*, 138 N.E.3d 75, 92 (Ill. App. Ct. 2018) (citing *In re Estate of LaPlume*, 24 N.E.3d 792, 798 (Ill. App. Ct. 2014) and *People ex rel. Webb v. Wortham*, 127 N.E.3d 106, 111 (Ill. App. Ct. 2018)).

> Contamination or any dissolved substances associated with the liquid plume which are not physically located under Amoco's Brooklyn terminal property.

(1993 Agreement, Dkt. 36-4, § IV(C)).  Because the 1993 Agreement is unambiguous, the Court interprets it according to "its plain and ordinary meaning."  *Buenz*, 882 N.E.2d at 529.

The 1993 Agreement is broad and requires ExxonMobil to defend BP against "any and all claims" "arising out of or otherwise relating to" the Greenpoint Contamination.  The use of the term "any and all" in the indemnification clause is not accompanied by any limiting language that would "suggest that the indemnity provided is not intended to cover claims resulting from [BP's] own negligence." *Id.* at 534.  This means that the agreement allocates responsibility between the parties for the Greenpoint Contamination regardless of their relative culpability: ExxonMobil promised to defend and indemnify BP for any and all culpability "relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume" not located under the BP Terminal, and this duty is not cabined by any limiting language that would require BP to defend itself for its own negligence in connection with the Greenpoint Contamination.  ExxonMobil received $1 million from BP in exchange for this promise.

ExxonMobil argues that the 1993 Agreement provides for a partial indemnity because the language of the agreement (1) does not expressly provide for indemnification for BP's own negligence and (2) states that ExxonMobil will not defend BP for or against claims related to contamination physically located under the BP Terminal.  (Defendant's Summary Judgment Brief ("Def. Br."), Dkt. 36-2, at 15.)  Neither argument is persuasive.

First, the court's analysis of the indemnity clause "depends upon the particular language used [by the parties] and the factual setting of the case." *Buenz*, 882 N.E.2d at 530.  In cases where Illinois courts construed the indemnity to be limited, the contractual language specifically provided

12

that the indemnitor's duty to defend only extends to claims arising out of indemnitor's *own conduct. See, e.g.*, *Gen. Cas. Co. of Ill.*, 2011 WL 10109741, at *11 (no indemnity for indemnitee's own negligence because the contract provided that the indemnitor would defend and indemnify indemnitee against claims arising from the indemnitor's conduct); *Blackshare v. Banfield*, 857 N.E. 2d 743, 745–46 (Ill. App. Ct. 2006) (same); *Hankins v. Pekin Ins. Co.*, 713 N.E. 2d 1244, 1248–49 (Ill. App. Ct. 1999) (same); *McNiff v. Millard Maint. Serv. Co.*, 715 N.E. 2d 247, 249–50 (Ill. App. Ct. 1999) (same); *see also BNSF Ry. Co. v. Probuild North LLC*, No. 1-12-3648 (PSN), 2014 WL 2619015, at *4 (Ill. App. Ct. Jun. 11, 2014) ("The indemnity clause . . . specifically provides . . . that '[i]f any claim or liability shall arise from the joint or concurring negligence of the parties hereto, it shall be borne by them equally.' Thus, the [agreement at issue] requires ProBuild to indemnify BNSF for losses other than the losses caused by the negligence of BNSF and BNSF's employees").[10]  No such limiting language is present here.

Second, the language in the indemnity provision that carves out the physical location under the BP Terminal does not limit the scope of the parties' agreement; it simply and plainly identifies a geographical area for which ExxonMobil bears no responsibility.  This does not indicate that the parties intended to limit allocation of liability according to their respective culpability, or distribute "loss among [BP and ExxonMobil] by requiring each to pay [its] proportionate share."[11]  *FHP*

---

[10] In addition to considering the contractual language, Illinois courts look to state statutes that limit indemnification for public policy reasons.  For example, Illinois statutes prohibit indemnitees in construction and healthcare industries from being indemnified for their own negligence.  *See Buenz*, 882 N.E.2d at 534–35.  No such statutes are applicable to the Court's analysis here.

[11] Although the Court does not consider evidence extrinsic to the four corners of the 1993 Agreement in reaching this conclusion, it is worth noting that Amoco bought the BP Terminal from ExxonMobil's predecessor, Mobil, which had owned and operated a petroleum refinery facility located on the property until 1965, and was later identified in the G&M Report as the likely cause of the oil spill detected by the Coast Guard in 1978.

*Tectonics Corp.*, 2016 WL 3387306, at *12.  Rather, it is clear that the parties intended to allocate responsibility to ExxonMobil regardless of culpability.  This is further supported by the Court's consideration of the relevant indemnity language in the context of the entire contract.  *Gen. Cas. Co. of Ill.*, 2011 WL 10109741, at *8.  The introductory recitals clearly state that the parties entered into the 1993 Agreement "in order to *fully resolve* all existing disagreement *over responsibility* and *allocate liability* for environmental contamination (including, among other things, third party personal injury and property damages claims) between Amoco and Mobil in connection with . . . the Greenpoint Contamination." (1993 Agreement, Dkt. 36-4, at 2 (emphasis added).)  Because a "contract must be construed as a whole, viewing each part of the contract in light of the others," *Hussar v. Brewster Condo. Corp.*, No. 1-17-2524 (TEH), 2018 WL 3130844, at *5 (Ill. App. Ct. Jun. 22, 2018), the Court "conclude[s] that the express language of the parties' agreement clearly and explicitly provides indemnification for [BP's] own negligence; that is, taken in their common and unambiguous meaning, the words used in the indemnification provision encompass even claims that arise out of [BP's own] negligence [relating to the Greenpoint Contamination]," *Nicor Gas Co. v. Vill. of Wilmette*, 884 N.E.2d 816, 822 (Ill. App. Ct. 2008).

Thus, under the 1993 Agreement, ExxonMobil is obligated to defend and indemnify BP for any and all culpability "relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume" not located under the BP Terminal," including contamination resulting from BP's own negligence.

### B.    The Release Clause in the 2004 Agreement

Under New York law, which governs the 2004 Agreement,[12] "[a] release is a contract, and its construction is governed by contract law." *Schiller v. Guthrie*, 958 N.Y.S.2d 736, 737 (App. Div. 2013). Therefore, "[w]here a release is unambiguous," the court must ascertain the intent of the parties "from the plain language of the agreement." *Id.* Courts "should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include," *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1001 (N.Y. 2011), or "'impos[e the court's] own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which' the parties have committed themselves," *CNR Healthcare Network, Inc. v. 86 Lefferts Corp.*, 874 N.Y.S.2d 174, 177 (App. Div. 2009) (quoting *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981)).

Generally, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial*, 952 N.E.2d at 1000. Where "there is no evidence that the agreement was not fairly and knowingly made or that the parties intended it to cover a narrower range of claims than its plain language suggests," the court should apply "the plain language of the release." *Rivera v. Wyckoff Heights Med. Ctr.*, 978 N.Y.S.2d 337, 341 (App. Div. 2014). Where a release is executed "in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if 'the language of the release is clear, the intent of the parties is indicated by the language employed.'" *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977) (brackets and ellipsis omitted) (quoting *German Roman Catholic Orphan Home v. Liberty Nat'l Bank & Trust*

---

[12] The parties do not dispute that the 2004 Agreement is governed by New York law.

15

*Co. (In re Schaefer)*, 274 N.Y.S.2d 869, 872 (1972)). However, "[t]he meaning and coverage of a general release depends on the controversy being settled and upon the purpose for which the release was actually given, and a general release may not be read to cover matters which the parties did not desire or intend to dispose of." *Huma v. Patel*, 890 N.Y.S.2d 639, 640 (App. Div. 2009) (internal quotation marks and citation omitted).

The parties do not contend that the 2004 Release is ambiguous. Therefore, the Court ascertains the parties' intent "from the plain language of the agreement." *Schiller*, 958 N.Y.S.2d at 737. Under the 2004 Agreement, BP "remise[d], release[d], and forever discharge[d]" ExxonMobil "of and from any and all . . . agreements . . . relating to . . . responsibility for remediating contamination at the Greenpoint Area." (2004 Agreement, Dkt. 36-5, § 6(b).) The parties dispute whether this language released ExxonMobil from defending BP against any and all claims relating to remediation of the Greenpoint Contamination, if claimants seek damages as opposed to, or in conjunction with, injunctive relief. [13]

ExxonMobil asserts that "the 2004 Agreement's release provision applies to 'any and all claims or demands whatsoever' relating to responsibility for remediating contamination in Greenpoint—and that, by its very terms, [this] includes claims or demands predicated upon a

---

[13] The parties appear to agree that the 2004 Agreement released ExxonMobil's obligation to indemnify and defend BP against suits that seek *remediation* of the Greenpoint Contamination, *i.e.*, injunctive relief. (*See* Plaintiff's Summary Judgment Brief ("Pl. Br."), Dkt. 37-1, at 3 ("[T]he plain language of the parties' separate 2004 Agreement did not release ExxonMobil's obligation to defend BP from the civil lawsuits seeking *compensatory damages*." (emphasis added)); Plaintiff's Opposition Summary Judgment Brief ("Pl. Opp. Br."), Dkt. 38, at 1–2 ("Such third party claims seeking money damages are not within the scope of the 2004 Agreement which provided a limited release for claims related to "responsibility for remediating contamination at the Greenpoint Area."); Defendant's Summary Judgment Brief ("Def. Br."), Dkt. 36-2, at 2 ("[B]ecause the plaintiffs in the underlying lawsuits sought remediation as a remedy for their claims, BP cannot seek reimbursement of the fees it incurred in defending against those claims because they released them as part of the 2004 agreement.").)

request (even a single one) for an order compelling ExxonMobil and BP to remediate the plume."
(Defendant's Summary Judgment Reply ("Def. Reply"), Dkt. 36-17, at 4.)  ExxonMobil's reading
of the 2004 Release is too broad.

While the plain language of the 2004 Release is broad in certain respects, it is
unambiguously limited to claims and causes of action "relating to" "responsibility for *remediating*
*contamination* at the Greenpoint Area."  (2004 Agreement, Dkt. 36-5, § 6(b) (emphasis added).)
Moreover, the 2004 Agreement provides that, "[e]xcept where amended by this Agreement, the
1993 Agreement shall remain in full force and effect."  (*Id.*, § 8; Def. 56.1, Dkt. 36-1, ¶ 7.)  The
parties' decision to expressly limit the 2004 release to "remediation" of the Greenpoint
Contamination belies any inference that the parties intended to include third-party claims and
causes of action for damages in that release, and thus ExxonMobil's 1993 agreement to defend BP
as to all claims relating to the Greenpoint Contamination remained intact after the 2004
Agreement, except as to remediation claims.  *See Zilinskas v. Westinghouse Elec. Corp.*, 669
N.Y.S.2d 703, 705 (App. Div. 1998) ("Here, the general language of the instrument releasing Oak
Mitsui 'from all claims of any kind or nature' was followed by a specific recital limiting the claims
released to those 'relating to the installation of a busway at [Oak Mitsui's] facility. By restricting
the general words of release to specific claims relating to the busway installation, the parties
expressed their clear intent that the release was to be operative only with respect to claims
regarding the busway."); *see also Carew v. Baker*, 109 N.Y.S.3d 205, 207 (App. Div. 2019) (the
release contained in a settlement agreement entered into by the plaintiff to discontinue a
disciplinary proceeding "alleging that he stole a coworker's tool and provided false information to
investigators" "clearly and unambiguously encompass[ed]" an "action to recover damages for

17

defamation" where the plaintiff alleged that he was "falsely accus[ed]" "of stealing the coworker's tool" and "that these accusations led to the disciplinary charges.").

The "controversy being settled" by the 2004 Agreement and "the purpose for which the release was actually given" both support the conclusion that the 2004 Release "may not be read to cover matters which the parties did not desire or intend to dispose of," *Huma*, 890 N.Y.S.2d at 640, namely, third-party suits for damages. The parties entered into the 2004 Agreement to resolve the 1999 Action, in which BP/Amoco alleged that ExxonMobil had breached the 1993 Agreement and as a result "sub-surface petroleum products attributable to the Mobil plume were continuing to migrate through the sub-surface under the Amoco terminal." (Pl. 56.1, Dkt. 37-2, ¶¶ 19, 21; Def. 56.1 Opp., Dkt. 36-16, ¶¶ 19, 21.) "ExxonMobil asserted a counterclaim, which alleged, among other things, that BP had breached the 1993 Agreement by failing to prevent subsurface petroleum products from migrating onto properties being remediated by ExxonMobil." (Def. 56.1, Dkt. 36-1, ¶ 4; Pl. 56.1 Opp., Dkt. 38-1, ¶ 4.) Thus, the parties asserted failure to remediate claims against each other and entered into the 2004 Agreement to resolve the 1999 Action, each agreeing to "maintain hydraulic control" on the southern and western boundaries of the BP Terminal, respectively, "to prevent petroleum products 'from migrating in the future'" to and from the BP Terminal. (Def. 56.1, Dkt. 36-1, ¶¶ 21–22; Pl. 56.1 Opp., Dkt. 38-1, ¶¶ 21–22.) The parties' focus on remediation in the 2004 Agreement is apparent. The 2004 Agreement clearly had nothing to do with third-party claims for damages, and the release provisions in that agreement cannot be read to encompass such claims.

Thus, because the 2004 Agreement provided that "the 1993 Agreement remain[ed] in full force and effect" otherwise (2004 Agreement, Dkt. 36-5, § 8; Def. 56.1, Dkt. 36-1, ¶ 7),

ExxonMobil still owed a duty to defend BP against any and all claims for damages related to the Greenpoint Contamination after the 2004 Agreement.

### C.    The Complaints in the *Baumbach* and *Spiroff* Actions

To determine an indemnitor's duty to defend an indemnitee against a particular legal action, "[c]ourts look first to the allegations of the underlying complaints." *Kmart Corp. v. Footstar, Inc.*, No. 09-CV-3607, 2012 WL 1080262, at *13 (N.D. Ill. Mar. 30, 2012) (citing *Am. Econ. Ins. Co. v. DePaul Univ.*, 890 N.E.2d 582, 588 (Ill. App. 2008)), *aff'd in part*, *rev'd in part*, 777 F.3d 923 (7th Cir. 2015).[14]   Unlike an insurer, which is obligated to defend the indemnitee "even if the allegations are groundless, false, or fraudulent," "an indemnitor may independently investigate [the underlying complaint] to determine whether the facts fall within the relevant indemnity provision." *Id.; see also Ervin v. Sears, Roebuck and Co.*, 469 N.E.2d 243, 249 (App. Ct. 1984).  "If, despite the allegations" in the underlying complaint, "the facts clearly show[] that there" are no claims covered by the indemnity contract, the indemnitor has no duty to defend the indemnitee.  *Sears, Roebuck and Co. v. Savoy Reinsurance Co., Ltd.*, No. 90-CV-1202 (WTH), 1991 WL 22501, at *4 (N.D. Ill. Feb. 15, 1991).  "But an indemnitor must have a good faith factual basis for denying coverage." *Kmart Corp.*, 2012 WL 1080262, at *13.  Thus, "a party to a contractual indemnity requirement may not refuse to defend when confronted with allegations in a complaint that could give rise to liability under the indemnity provision, without actually exercising its right to look behind the bare allegations." *Litterer v. United States*, 545 F. Supp. 3d 625, 638 (N.D. Ill. 2021) (internal quotation marks, ellipsis, and brackets omitted).

---

[14]   Because ExxonMobil's duty to defend and indemnify BP arises under the 1993 Agreement, the Court again turns to Illinois law, which governs the 1993 Agreement with a caveat previously stated *infra* n.8.

The complaints in the Greenpoint Contamination Litigation alleged that the plaintiffs "suffer[ed] ongoing injury and damages to their persons and properties" due to the Greenpoint Contamination caused by BP, ExxonMobil, and other defendants. (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 1–2; Spiroff Fifth Am. Cmpl., Dkt. 35-7, ¶¶ 1–2.) Relying on the 1979 G&M Report, the plaintiffs alleged that the historic oil spill resulted in millions of gallons of Plume and that BP and others took "little action, if any, . . . to eliminate, correct, and or remedy the [Plume] or prevent its continued migration." (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 411–13, 416; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 41–43, 46.) The plaintiffs thus alleged that the defendants had failed to remediate the historic oil spill and that the ongoing migration of Plume resulted in permanent and continuing harm to the plaintiffs. (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 417–22; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 48–58.)

BP and ExxonMobil dispute whether the claims in the Greenpoint Contamination Litigation are covered by the 1993 Agreement's indemnity provision, given the carve-out created by the release in the 2004 Agreement for remediation claims. (2004 Agreement, Dkt. 36-5, ¶ 6(b) (BP "remises, releases, and forever discharges" ExxonMobil "of and from any and all . . . agreements . . . relating to . . . responsibility for remediating contamination at the Greenpoint Area.").) BP argues that because the *Baumbach* and *Spiroff* plaintiffs sought only damages, and not injunctive relief, the release in the 2004 Agreement does not apply, and ExxonMobil is bound by the 1993 Agreement to defend and indemnify BP in the Greenpoint Contamination Litigation. But BP's assertion that the Greenpoint Contamination Litigation did not seek injunctive relief is plainly incorrect. The complaints in the Greenpoint Contamination Litigation requested, in addition to costs for medical and property injuries, injunctive relief, "including, but not limited to, an order compelling [defendants] to take specific actions to cleanup, remediate, and/or correct the

[Plume]." (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 437–39; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 77–79.) In an attempt to avoid this incontrovertible fact, BP argues that plaintiffs did not actually seek injunctive relief because their requests for injunctive relief were in "a single paragraph contained in the general allegations" of the complaints and "appear[] nowhere in any of the . . . specific legal claims or in any of the *ad damnum* clauses."[15] BP does not cite to any legal authority to support its position that a request for injunctive relief, incorporated by reference into each cause of action, is not a request for injunctive relief. There is no need to look beyond the facial allegations in the *Baumbach* and *Spiroff* complaints to determine that those actions plainly sought injunctive relief in the form of remediation, for which BP released any and all claims against ExxonMobil in the 2004 Agreement.[16] Because BP released ExxonMobil from all agreements relating to claims for remediation of the Greenpoint contamination, *i.e.*, injunctive relief, BP, not ExxonMobil, had to defend BP in the *Baumbach* and *Spiroff* actions against such claims.

However, that does not mean that ExxonMobil's duty to defend BP was not triggered with respect to the other claims brought in the Greenpoint Contamination Litigation. The *Baumbach* and *Spiroff* plaintiffs sought in excess of $1 billion for damages "arising out of or otherwise relating

---

[15] BP attempts to differentiate between the *Baumbach* and *Spiroff* complaints, but both contain an identical request for injunctive relief. (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶ 439; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶ 79.) Moreover, BP's argument that Magistrate Judge Robert Levy's August 2006 Report and Recommendation in a prior case, adopted by District Judge Carol Amon, finding that the *Baumbach* plaintiffs sought strictly monetary damages, is not persuasive. First, that decision was issued before the *Baumbach* complaint was amended and, as already discussed, the Court relies on the operative complaints in the underlying actions in its analysis, *see supra* n.5. Second, the decision addressed ExxonMobil's motion to join BP and another party in the *Markowitz* action, *see supra* n.6, and is not related the issues raised here.

[16] That the *Baumbach* and *Spiroff* Actions settled for damages only does not mean that the plaintiffs did not seek injunctive relief in their complaints. Settlements are compromises and it is common for parties to accept an outcome different or less than that sought in the complaint.

SPA-22

to environmental contamination associated with a[] portion of the Greenpoint Contamination [and] dissolved substances associated with the liquid plume which are not physically located under" the BP Terminal.   (1993 Agreement, Dkt. 36-4, § IV(C)).   The Court therefore concludes that ExxonMobil, "confronted with allegations in a complaint that could give rise to liability under the indemnity provision," did not have a good faith basis to refuse to defend BP against these claims. *Litterer*, 545 F. Supp. at 638 (brackets omitted).   ExxonMobil concedes as much but argues that "[a]t least *some* of the *Baumbach* and Napoli plaintiffs' allegations and claims fall outside the scope of the 1993 Agreement's indemnification provision" because "the *Baumbach* and Napoli plaintiffs alleged, among other things, that they were injured by oil and oil products that were either underneath or migrated off of the BP Terminal."   (Defendant's Opposition Summary Judgment Brief ("Def. Opp. Br."), Dkt. 36-15, at 3–4, 6 (emphasis added, original emphasis removed)); *see also id.* at 1 (arguing that ExxonMobil was not obligated to defend BP against "claims supported by *such* allegations" and that "BP was obligated to defend itself against *such* claims" (emphasis added).)

ExxonMobil is correct that the complaints in the Greenpoint Contamination Litigation included allegations that the plaintiffs were injured by oil and oil products that were either underneath or had migrated off of the BP Terminal.   For example, the complaints alleged, among other things, that: (1) "Due to the . . . actions of the various defendants [including BP], millions of gallons of oil and oil products have been released into the ground and Defendants have continued to this date to fail to remove the contamination which migrated and continues to migrate onto plaintiffs' properties causing plaintiffs to suffer ongoing injury . . . ."; (2) "Defendant[] BP . . . so negligently stored, transported, and/or disposed of . . . oil and oil products[] so as to cause severe contamination of the ground, soil, groundwater, and/or aquifer, and/or said defendant[] own[s] or

owned property upon which such actions and/or results occurred"; and (3) "Defendant[] BP . . . [is and was a person] who discharged, participated in actions constituting discharge, and/or [was] otherwise [a] discharger[] of petroleum. . . . Defendant[] discharged petroleum and/or petroleum was discharged into properties owned, leased, occupied, and/or otherwise controlled by defendant[]. . . . As a result of defendant[']s[] discharge of petroleum onto and into state lands, waters, and plaintiffs' properties, plaintiffs and their properties have been injured . . . .". (Def. Br., Dkt. 36-2, at 5–8 (brackets in original) (quoting Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 2, 409, 434, 485–86, 489; Spiroff Fifth Am. Cmpl., Dkt. 35-7, ¶¶ 2, 39, 74, 146–47, 150).)

BP asserts that the complaints relied on historical contamination of Greenpoint, as determined by G&M in 1978, and that the harm stems from contamination that has not been remediated. What BP misses, however, is that the complaints allege an ongoing migration of Plume physically located under the BP Terminal onto the plaintiffs' properties. (*See, e.g.*, Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶ 420; Spiroff Fifth Am. Cmpl., Dkt. 35-7, ¶ 56 ("The actions chosen and taken by [defendants] were with knowledge that such delay and minimal action would cause the [oil and oil products] to disburse and migrate off of the [terminals] [including the BP Terminal] . . . and onto plaintiffs' land and property"); Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶ 423 and Spiroff Fifth Am. Cmpl., Dkt. 35-7, ¶ 59 ("As [oil and oil products] migrate from [defendants'] property . . . [and] result in new . . . hazardous materials . . . interfering with the rights of plaintiffs as a result of [defendants'] actions.").) Such allegations fall squarely outside of the parties' allocation of liability for the Greenpoint Contamination to ExxonMobil after the 2004 Agreement.

BP argues that, even if the Greenpoint Contamination Litigation complaints asserted certain claims against which ExxonMobil was not required to defend BP, the complaints can be

characterized as "mixed allegation" under Illinois law, which requires ExxonMobil to defend BP against *all* claims.  But the concept of "mixed allegation" complaints is borrowed from insurance law, and "Illinois courts recognize that there is a fundamental difference between insurers and non-insurers." *Wilda v. JLG Indus., Inc.*, 470 F. Supp. 3d 770, 787 (N.D. Ill. 2020) (internal quotation marks omitted).  Non-insurers "simply do not have the same specialized experience of providing insurance as an actual insurance company," and "[t]he reason for imposing a heightened duty to defend on insurers—because they are professional sellers of insurance—is therefore not present in the non-insurance context." *Dominick's Finer Foods, LLC v. Eurest Servs., Inc.*, No. 1-15-369 (LCL), 2015 WL 6735491, at *7 (Ill. App. Ct. Nov. 2, 2015).  The distinction between insurers and non-insurers is especially significant here, where the parties' agreements contain certain carve-outs—one for claims arising out of Plumes located under the BP Terminal and one for claims seeking injunctive relief in the form of remediation.  While these carve-outs do not apportion liability based on relative culpability, they do demonstrate a clear intent between two sophisticated parties to clearly define the scope of ExxonMobil's duty to defend BP in litigation related to lawsuits such as the Greenpoint Contamination Litigation.  *Cf. Litterer*, 545 F. Supp. 3d at 641–42 ("The obvious intent of indemnity provision was for the City to avoid having to incur costs in suits arising out of or related to [United Maintenance Services, Inc.'s ('UMS')] work[.] . . . Litterer's 2018 complaint contained allegations that triggered UMS's obligation . . .").

BP relies on two cases to support its position, but neither helps its cause.  First, in *Sears, Roebuck v. Insurance Company of North America*, the court held that a non-insurer indemnitor had a duty to defend an indemnitee pursuant to a purchase agreement because "[i]n the event of a so-called mixed allegation complaint, where there is doubt as to whether a theory of recovery within the policy coverage has been pleaded in the underlying complaint, the insurer *must* defend."

No. 89 C 5795 (GWL), 1990 WL 115570, at *3–4 (N.D. Ill. Aug. 9, 1990) (internal quotation marks omitted). In so holding, the court explicitly relied on insurance law. As already discussed, Illinois courts draw a distinction between insurers and non-insurers, and well-established insurance law doctrines do not neatly map onto non-insurance cases. Second, BP relies on *Kmart Corporation*, where the court held that a non-insurer indemnitor's duty to defend was triggered where the underlying personal injury complaint and its supporting facts did "not show that [the indemnitor] 'indisputably' had no causal connection to [the plaintiff's] injury." 2012 WL 1080262, at *15. The underlying complaint there alleged, and an investigation of the facts revealed, that the indemnitor's employee may have been responsible for the indemnitee's customer's injuries. The court thus held that "[e]ven if liability was ultimately based only on [the indemnitee's] actions, . . . [the indemnitor] would still have a duty to defend to the extent that there exist claims that [the indemnitor] potentially caused the accident." *Id.* Significantly, the court found that the indemnitor would have to defend the indemnitee *to the extent* the suit's claims fell within the parties' agreement. *Id.* That is exactly the result the Court reaches here. ExxonMobil did not and could not breach the 1993 Agreement by refusing to defend BP against claims that were beyond the scope of ExxonMobil's contractual duty. *See 933 Van Buren Condo. Ass'n v. West Van Buren, LLC*, 61 N.E.3d 929, 942 (Ill. App. Ct. 2016) ("Total did not breach the indemnification agreement with WVB when it refused to defend WVB against the HOA's fraud claims as those claims fell outside the scope of the indemnification provision."); *cf. id.* at 943–44 ("We find that [warranty of habitability] allegations, which arise out of faulty work on the roof, fall within the scope of both indemnification clauses, thus triggering IRCA's and Total's duties to defend *with respect to these claims*." (emphasis added)).

BP also argues that the case relied on by ExxonMobil, *Dominick's Finer Foods, LLC*, 2015 WL 6735491, at \*36, "simply found that a private indemnitor had no obligation to defend a Complaint when 'there were no allegations in the Complaint that any act or omission of [indemnitor's] employee caused any of [plaintiff's] injuries'"—which is not the situation here. (Pl. Reply, Dkt. 39, at 3–4 (brackets in original).)  A full reading of that case further demonstrates the distinct treatment of insurers and non-insurers under Illinois law.  In *Dominick's*, the court found that the non-insurer indemnitor did not have a duty to defend because "the claims brought against [the indemnitor] were alternative to the claims asserted against [the indemnitee]."  2015 WL 6735491, at \*8.  However, the court also found that had the indemnitor procured insurance naming indemnitee as an additional insured, as required by the parties' contract, the insurer—unlike the non-insurer indemnitor—would have owed a duty to defend the indemnitee.  *Id.* at \*10 ("It is not surprising that defendant, a floor cleaning company, chose to reject plaintiff's tender.  We would not expect the same result from an insurance company.  Presumably, the insurance company would have recognized that the [plaintiff-indemnitees'] second amended complaint potentially exposed plaintiff to liability for a negligent act of defendant, thereby requiring it to provide plaintiff with a defense.").

Thus, the Court finds that, by operation of the 1993 and 2004 Agreements, ExxonMobil had a duty to defend and indemnify BP with respect to the damages claims in the Greenpoint Contamination Litigation, but not with respect to the remediation (injunctive relief) claims.

### D.    Waiver of Claims and Defenses

BP asserts that ExxonMobil waived its right to assert defenses in this action.  Because BP's claims are premised on the 1993 Agreement, Illinois law applies.[17]

Under Illinois law, "[w]aiver is an express or implied relinquishment of a known right." *Acuity v. Southwest Spring, Inc.*, No. 1-14-2380 (FS), 2016 WL 363109, at *8 (Ill. App. Ct. Jan. 20, 2016); *Essex Ins. Co. v. Stage 2, Inc.*, 14 F.3d 1178, 1181 (7th Cir. 1994); *see also Lumbermen's Mut. Cas. Co. v. Sykes*, 890 N.E.2d 1086, 1097 (Ill. App. Ct. 2008) ("[W]aiver is an equitable principle invoked to further the interests of justice whenever a party initially relinquishes a known right or acts in such manner as to warrant an inference of such relinquishment." (internal quotation marks omitted)).  "An implied waiver of a legal right may arise when conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive it." *Liberty Mut. Ins. Co. v. Westfield Ins. Co.*, 703 N.E.2d 439, 441 (Ill. App. Ct. 1998).  "Waiver, like estoppel, depends on the facts of the case."  *Frain Camins & Swartchild, Inc. v. Bank of Am. Nat. Tr. And Sav. Ass'n*, No. 91 C 8165 (JBZ), 1994 WL 174149, at *6 (N.D. Ill. May 4, 1994). The party asserting waiver bears the burden of proof "by clear, precise and unequivocal evidence." *Id.* at *5.  "Where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law as to whether the facts proved constitute waiver." *Liberty Mut. Ins. Co.*, 703 N.E.2d at 441.  "However, if the facts necessary to constitute waiver are in dispute or if reasonable minds might differ as to inferences to be drawn from undisputed evidence, then the issue becomes a question of fact." *Wald v. Chicago Shippers Ass'n*, 529 N.E.2d 1138, 1148 (Ill. App. Ct. 1988).

---

[17] As already discussed, the parties generally agree that Illinois law governs the 1993 agreement, *see supra* n.8.

BP relies on insurance law in arguing that ExxonMobil waived its right to assert defenses in this action. BP's reliance on insurance law is once again misplaced. "An insurer that denies its own liability under [an insurance] policy has three alternatives: (1) seek a declaratory judgment regarding its obligations before or pending trial of the underlying action; (2) defend the insured under a reservation of rights; or (3) refuse either to defend or to seek a declaratory judgment." *Eclipse Mfg. Co. v. U.S. Compliance Co.*, 886 N.E.2d 349, 356 (Ill. App. Ct. 2007) (internal quotation marks and brackets omitted). "An insurer chooses the last option at its own peril, because, if it is later found to have wrongfully denied a defense to its insured, it will have breached its insurance contract" and is estopped from "asserting any defense based on noncoverage." *Those Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.*, 848 N.E.2d 597, 604 (Ill. App. Ct. 2006). This principle "is deeply rooted in Illinois jurisprudence" and "arose out of the recognition that an insurer's duty to defend under a liability insurance policy is so fundamental an obligation that a breach of that duty constitutes a repudiation of the contract." *Eclipse Mfg. Co.*, 886 N.E.2d at 356. As already discussed, Illinois courts distinguish between insurers and non-insurer indemnitors. "[I]n contrast [to insurance policies], the agreement to defend and indemnify in a [non-insurance] contract . . . is incidental to the main purpose of the agreement . . . ." *Ervin*, 469 N.E.2d at 249. "Given the unique position of an insurance company as a professional 'seller' of protection against loss, and the fundamentally different role of" a non-insurer, *id.* at 249–50, the insurance law principles of waiver are inapplicable here.

Moreover, BP's waiver argument under insurance law would fail even if it applied. BP tendered its defense to ExxonMobil on May 19, 2006. (BP's May 19, 2006 Letter, Dkts. 36-8, 37-13, at 1–2.) In a letter dated February 7, 2007, while the Greenpoint Contamination Litigation was still ongoing, ExxonMobil responded that it was "willing to assume BP's defense and indemnify

BP, subject to [certain] terms and conditions." (ExxonMobil's Feb. 7, 2007 Letter, Dkts. 36-9, 37-14, at 2.) BP refused to accept ExxonMobil's proposal (BP's March 7, 2007 Letter, Dkt. 36-10, at 4), and the parties agreed to toll their claims "for failure to maintain hydraulic control pursuant to the 2004 Agreement and for reimbursement of defense costs, respectively" (Def. 56.1, Dkt. 36-1, ¶ 15). Under these circumstances, BP has failed to show by "clear, precise and unequivocal evidence," *Frain Camins & Swartchild, Inc.*, 1994 WL 174149, at *5, that ExxonMobil impliedly intended to waive its defenses to BP's tender, *Liberty Mutual Ins. Co.*, 703 N.E.2d at 441. *Cf. Royal Ins. Co. v. Process Design Assocs., Inc.*, 582 N.E.2d 1234, 1239 (Ill. App. Ct. 1991) ("If the insurer has adequately informed the insured of its election to proceed under a reservation of rights, and the insured accepts the insurer's tender of defense counsel, the insurer has not breached its duty of loyalty and is not estopped from asserting policy defenses.").

For the same reasons, BP's request for summary judgment on ExxonMobil's Third and Fourth affirmative defenses—that BP waived and is equitably estopped from asserting its claims—is denied. Because "reasonable minds might differ as to inferences to be drawn from" the parties' exchange of letters regarding BP's tender of defense to ExxonMobil, the issue must be decided by the jury at trial. *Wald*, 529 N.E.2d at 1148.

* * * *

In sum, ExxonMobil had a duty to defend BP in the *Baumbach* and *Spiroff* actions against all claims, with exception of claims related to contamination located under the BP Terminal and claims for remediation of the Greenpoint Contamination.

## II.  ExxonMobil's Affirmative Defenses

The Court has already determined that certain claims in the Greenpoint Contamination Litigation triggered ExxonMobil's duty to defend BP, that the 2004 Agreement did not release ExxonMobil from this duty, and that the question of whether BP waived its claims in this action

29

is an issue of fact for the jury.  Accordingly, the Court grants BP's request for summary judgment

on ExxonMobil's First and Second affirmative defenses and denies BP's request for summary

judgment on the Third and Fourth affirmative defenses.  The Court addresses the parties'

arguments regarding the remaining affirmative defenses below.  Given that BP's claims in this

action are premised on the 1993 Agreement, Illinois law generally applies here, although, as

discussed below, the parties raise a choice-of-law issue regarding the analysis of reasonableness

of BP's fees and costs.

### A.    Damages and Reasonableness of Fees and Costs

Because the Court finds that ExxonMobil's duty to defend BP did not extend to all claims

asserted in the Greenpoint Contamination Litigation, there is a genuine issue of fact as to the

reasonable amount of fees and costs BP had to expend in its defense against the claims that should

have been defended by ExxonMobil pursuant to the parties' 1993 Agreement and 2004 Agreement.

*See Ill. Sch. Dist. Agency v. Pac. Ins. Co.*, 471 F.3d 714, 723 (7th Cir. 2006) (indemnitee "bear[s]

the burden of proving the amount of costs expended in defending the" covered claim); *Ill. Sch.

Dist. Agency v. Pac. Ins. Co.*, No. 02 3173 (JES), 2004 WL 5187418, at *1 (C.D. Ill. Nov. 1, 2004)

("The Court set the matter for trial to determine the amount of fees and expenses incurred by the

[indemnitee] that were properly allocated to defending the [covered c]laim and the reasonableness

of those fees and expenses."); *see also St. Michael's Orthodox Catholic Church v. Preferred Risk

Mut. Ins. Co.*, 496 N.E.2d 1176, 1179 (Ill. App. Ct. 1986) (holding that, at trial, "[w]here part of a

loss resulted . . . from a peril not covered by insurance, the insured must show the amount of the

loss that is covered by [its] policy").

The Court therefore does not address the parties' arguments regarding choice of law on

this issue.  That will be resolved through motions *in limine* and/or proposed jury instructions.  Even

assuming, however, that BP's choice-of-law theory is correct and the Illinois market approach

applies here, summary judgment would still be inappropriate. While the Court may be able to presume that BP's fees were reasonable, there is a genuine issue of fact as to allocation of fees to ExxonMobil for covered claims based on its duty to defend. *See Ill. Sch. Dist. Agency*, 2004 WL 5187418, at *5 ("A defense cost is related to the defense of a covered claim if the cost would reasonably have been incurred had the covered claim been without the other claims."). Accordingly, BP's request for summary judgment on ExxonMobil's Fifth Affirmative Defense and ExxonMobil's request for summary judgment on BP's expectation damages are therefore denied.

### B.    Prejudgment Interest

Under Illinois law, prejudgment interest is due where there is "a debtor-creditor relationship" between the parties and "the amount due [is] 'fixed or easily computed' prior to judgment." *South Bend Lathe, Inc. v. Amsted Indus., Inc.*, 925 F.2d 1043, 1049 (7th Cir. 1991). "[A] contractual obligation is sufficient to establish a debtor-creditor relationship." *Id.* "Interest begins to accrue when the underlying attorneys' fees become liquidated, i.e. 'due and capable of exact computation.'" *Santa's Best Craft, LLC v. St. Paul Dire and Marine Ins. Co.*, 611 F.3d 339, 355 (7th Cir. 2010) (quoting *Conway v. Country Cas. Ins. Co.*, 442 N.E.2d 245, 250 (1982)). "A sum is liquidated if calculation does not require judgment, discretion, or opinion." *Id.* (internal quotation marks omitted). "But, a good-faith defense to liability does not bar prejudgment interest if the amount is ascertainable." *Id.* "[D]amages can be easily determinable 'even where the amount due requires legal ascertainment.'" *SNA Nut Co. v. Haagen-Dasz Co., Inc.*, 302 F.3d 725, 735 (7th Cir. 2002) (quoting *Fabe v. Facer Ins. Agency, Inc.*, 773 F.2d 142, 146–47 (7th Cir. 1985) (collecting cases)). The decision whether to award prejudgment interest is within the district court's sound discretion. *See Statewide Ins. Co. v. Houston Gen. Ins. Co.*, 920 N.E.2d 611, 624 (Ill. App. Ct. 2009).

31

Although the determination of BP's damages requires "legal ascertainment," the amount will be based on existing attorney billing records and is therefore easily determinable. *South Bend Lathe, Inc.*, 925 F.2d at 1049 (prejudgment interest appropriate where there is "a list of . . . attorneys' fees . . . known to the penny at the time [the debtor] incurred them."); *see also Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 519 (7th Cir. 1999) ("[MHC]'s [litigation] expenses were known and calculated at the time Medcom incurred them, justifying the award of prejudgment interest. MHC received and paid legal bills in determinate amounts; the total could be mechanically calculated, unlike (say) damages for lost profits.").

The Court therefore denies ExxonMobil's request for summary judgment seeking denial of prejudgment interest.[18]

**C.    The Illinois Joint Tortfeasor Act ("JTCA")**

The JTCA provides that "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them." 740 Ill. Comp. Stat. 100/2(a). However, "[t]he tortfeasor who settles with a claimant [in good faith] is discharged from all liability for any contribution to any other tortfeasor." *Id.* 100/2(d). "The purpose of the Contribution Act is to balance the equities between all culpable parties while ensuring that plaintiffs do not receive double recovery." *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co., Ltd.*, 522 F.3d 776, 783 (7th Cir. 2008).

---

[18] Moreover, even if BP were not entitled to prejudgment interest under the Illinois statute that provides for prejudgment interest, prejudgment interest likely would still be appropriate under the 1993 Agreement itself. *See Medcom Holding Co.*, 200 F.3d at 519 ("An indemnity clause is designed to make the wronged party whole—to put it in the same position it would have occupied had the other side kept its promise. . . . The way to make the prevailing party whole is to provide prejudgment interest at the market rate . . . .").

ExxonMobil argues that it negotiated a good-faith settlement of all claims in the *Spiroff* and *Baumbach* Actions on its own and BP's behalf and therefore extinguished any liability it might have for contribution to BP. ExxonMobil's argument is premised on its conclusion that the 1993 Agreement is a "partial indemnity" under Illinois law. Because the Court finds that the 1993 Agreement is not a "partial indemnity," the JTCA is inapplicable here. BP's request for summary judgment on ExxonMobil's Seventh affirmative defense is thus granted.

**III.    BP's Request for Declaratory Judgment**

Declaratory judgment serves "no useful purpose" where a filed lawsuit "will necessarily settle the issues for which the declaratory judgment is sought." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010); *see also Intellectual Capital Partner v. Inst. Credit Partners LLC*, No. 08-CV-10580 (DC), 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009) ("[D]eclaratory relief would serve no useful purpose as the legal issues will be resolved by litigation of the breach of contract claim"); *Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't Corp.*, No. 08-CV-1558 (RMB), 2009 WL 577916, at *11 (S.D.N.Y. March 2, 2009) ("Because this Court has already analyzed the parties' rights and obligations under the [contracts] in connection with Plaintiffs' breach of contract claims, a declaratory judgment on the same issues would be superfluous." (internal quotation marks and brackets omitted)).

BP argues that its declaratory judgment claim is not duplicative of its breach of contract claim because ExxonMobil's refusal to defend BP in another civil lawsuit—*Christina Auriemma and Theresa Eisenbach v. ExxonMobil Corporation, et al.*—has caused BP to continue to incur defense costs. But *Auriemma* was filed after BP commenced the present litigation and BP never sought to amend its complaint to include *Auriemma* in its allegations and claims here. BP cannot now rely on an entirely separate and never before mentioned litigation to support its claim for declaratory judgment. BP's declaratory judgment claim is therefore dismissed.

33

SPA-34

## CONCLUSION

For the reasons stated in this Memorandum and Order, the parties' cross-motions for summary judgment are granted in part and denied part.  In sum, the Court finds that:

(1) ExxonMobil had a duty to defend BP in the *Baumbach* and *Spiroff* actions against all claims, with the exception of claims related to contamination located under the BP Terminal and claims for remediation (injunctive relief) of the Greenpoint Contamination.

(2) There remain disputed issues of material fact that must be tried to a jury regarding: (a) whether BP waived and is equitably estopped from asserting its claims in this action; and (b) the reasonable amount of fees and costs BP had to expend in its defense against claims that should have been defended by ExxonMobil pursuant to the parties' 1993 Agreement and 2004 Agreement.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 28, 2022
Brooklyn, New York

34

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| | |
|---|---|
| BP PRODUCTS NORTH AMERICA INC. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   1:19-cv-03288 (PKC) |
| EXXONMOBIL CORPORATION | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ _____ .

☑ other:    A jury verdict having been returned in favor of the defendant, it is hereby ordered that the plaintiff recover nothing and that each party bear their own costs.

This action was *(check one)*:

☑ tried by a jury with Judge _____ Pamela K. Chen, U.S. District Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☐ decided by Judge _____ on a motion for

Date:    10/19/2023 _____          *CLERK OF COURT*

*s/F. Gonzalez, Deputy Clerk*
_____
*Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
BP PRODUCTS NORTH AMERICA INC.,

                    Plaintiff,

        - against -

EXXONMOBIL CORPORATION,

                    Defendant.
--------------------------------------------------------x

                              **MEMORANDUM & ORDER**
                               19-CV-3288 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

        Plaintiff BP Products North America Inc. ("Plaintiff" or "BP") brought this breach of contract action against ExxonMobil Corp. ("Defendant" or "ExxonMobil") claiming approximately $4.3 million in fees and costs incurred by BP in defending itself against certain third-party actions brought by residents and businesses for oil spill contamination in Greenpoint, a mixed-use neighborhood in Brooklyn, New York. BP's claims stem from the terms of a 1993 defense and indemnification agreement with ExxonMobil. This matter was tried before a jury in October 2023, resulting in a defense verdict on the breach of contract claim. Currently before the Court is Plaintiff's motion for a new trial pursuant to Federal Rule of Civil Procedure ("Rule") 59(a). For the reasons set forth below, Plaintiff's motion for a new trial is denied.

## BACKGROUND[1]

### I.    Factual Background

In 1968, BP's predecessor, Amoco Oil Co. ("Amoco"), purchased a portion of a property in Greenpoint from ExxonMobil's predecessor, Mobil Oil Corp. ("Mobil"), and began operating a terminal from that property (the "BP Terminal"). *BP Prods. N. Am. Inc.*, 2022 WL 4538555, at \*1. Mobil retained part "of the refinery property which it used as a petroleum bulk storage and distribution terminal" (the "ExxonMobil Terminal"). *Id.* On May 6, 1993, Amoco and Mobil entered into an agreement as part of a settlement to resolve disputes surrounding a 1978 oil spill and related sub-surface contamination in Greenpoint.[2] (Ex. A of Cooperman Decl., Dkt. 102-3 ("1993 Agreement"), at 1–19.) Under the terms of the 1993 Agreement, Mobil agreed:

> [T]o defend, indemnify, and hold harmless Amoco and its Affiliates from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including any attorney's fees), asserted by governmental or nongovernmental plaintiffs, complainants, or claimants, arising out of or otherwise relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume which are *not* physically located under [the BP Terminal].

(*Id.* at 17 (emphasis added).) Following a dispute over whether petroleum products attributable to the Mobil spill were continuing to migrate through the sub-surface under the BP Terminal, the

---

[1] The Court assumes the parties' familiarity with the underlying facts in this matter. As such, this section provides a brief summary of the background of the case and the relevant procedural history. (*See* Summ. J. Mem. & Order, Dkt. 43, at 2–7); *see also BP Prods. N. Am. Inc. v. ExxonMobil Corp.*, No. 19-CV-3288 (PKC) (ST), 2022 WL 4538555, at \*1–4 (E.D.N.Y. Sept. 28, 2022). Substantive evidence introduced during the trial relevant to specific issues is summarized in the Discussion section.

[2] The Coast Guard identified the oil spill in 1978 and retained an environmental consulting firm to investigate the nature of the spill. (*See* Summ. J. Mem. & Order, Dkt. 43, at 2 & 13 n.11.) The resulting investigative report identified the BP terminal as the likely cause of the spill. (*Id.* at 13 n.11.)

2

parties entered into another settlement agreement in 2004.  (*See* Ex. D of Crozier Decl., Dkt. 105-4 ("2004 Agreement"), at ECF 1–27.)[3]  Under the 2004 Agreement, Plaintiff and Defendant agreed to "maintain hydraulic control" on the southern and western boundaries of the BP Terminal, respectively, to prevent petroleum products "from migrating in the future onto the BP [Terminal]." (*Id.* at ECF 4.)  In addition, the 2004 Agreement "remise[d], release[d,] and forever discharge[d]" ExxonMobil "of and from any and all manner of action and cause of action . . . claims and demands whatsoever, . . . whether known or unknown, which against [ExxonMobil], [BP] ever had or now have relating to . . . responsibility for remediating contamination at the Greenpoint Area[.]"[4]  (*Id.* at ECF 18–19.)  The 2004 Agreement also stated that "[e]xcept where amended by this Agreement, the 1993 Agreement shall remain in full force and effect."  (*Id.* at ECF 19.)

Between October 2005 and April 2006, groups of Greenpoint residents, property owners, and renters (collectively, "civil plaintiffs"), sued BP and ExxonMobil for "negligent, willful, and/or wanton actions" resulting in the spill of "millions of gallons of oil and oil products . . . into the ground" and for failing "to remove the contamination which migrated and continues to migrate onto plaintiffs' properties."  (*Baumbach*[5] Fifth Am. Compl., Dkt. 105-10 ("*Baumbach* Fifth Am. Compl.") ¶¶ 1–2; *see Spiroff* Am. Class Action Compl., Dkt. 105-9 ("*Spiroff* Am. Class Action

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[4] The "Greenpoint Area" is defined in the 2004 Agreement as the "areas where ExxonMobil formerly had its refinery operations, Newtown Creek, and areas adjacent to these areas where ExxonMobil is performing or may in the future perform remediation work," in addition to the BP Terminal and the ExxonMobil Terminal.  (*Id.* at ECF 2.)

[5] The "*Baumbach*" litigation and the "*A.B. Jewels*" litigation both refer to the same case. (*See* Trial Trs., Dkt. 107–110 ("Tr.") at 335:17–25 ("Q. If you look at this, Ms. Drazdys. We saw the first plaintiff on the original complaint was somebody whose name is Baumbach, the first plaintiff here is A.B. Jewel Associates Inc.  Is this the same case?  A. It is.").)

Compl.") ¶¶ 1–2 (collectively, the "Greenpoint Contamination Litigation" or "underlying litigation").)  The civil plaintiffs sought damages for medical and property injuries, and injunctive relief in the form of an order compelling remediation.  (*Baumbach* Fifth Am. Compl. at 187–88, 199–201; *Spiroff* Am. Class Action Compl. at 17, 36–40.)

In 2006, when BP asked ExxonMobil to defend and indemnify BP against the civil plaintiffs in the Greenpoint Contamination Litigation, ExxonMobil responded that they would defend and indemnify BP "subject to certain specified conditions that ExxonMobil asserted were consistent with the terms of the 1993 and 2004 agreements.  BP disagreed that ExxonMobil's conditions were consistent with the terms of the 1993 and 2004 agreements." (Tr. at 766: 22–767:11.)  For several years, BP and ExxonMobil separately and simultaneously defended themselves in the Greenpoint Contamination Litigation.  Between 2011 and 2013, ExxonMobil negotiated settlements of all claims in the *Spiroff* and *Baumbach* actions.  (*See Spiroff* Stipulation, Dkt. 36-12, at ECF 2; *Baumbach* Stipulation, Dkt. 36-11, at 6; Tr. at 413:20–414:1.)  In each settlement, ExxonMobil secured a full release and discharge of all claims against both ExxonMobil and BP in exchange for payments[6] made solely by ExxonMobil.  (*See* Settlement of Greenpoint Claims Ltr. Understanding, Dkt. 105-8, at ECF 4 ("[T]he Settlement Amount . . . shall be made in exchange for very broad releases that will release all defendants . . . including ExxonMobil, BP, and Roux.").)

---

[6] ExxonMobil paid $10 million in the *Spiroff* settlement and $18 million in the *Baumbach* settlement.  (*See* Tr. at 530:16–23 ("So the agreement essentially would be a payment to the [*Spiroff*] plaintiffs, and in exchange the plaintiffs would drop their lawsuit and, . . . release their claims. . . . It's my understanding, at least according to this document, [the settlement] was $10 million.") (discussing settlements negotiated by Exxon), 533:18 (testifying that the *Baumbach* settlement was approximately "18 million, I think, in [that] range").)

4

SPA-40

## II.     Procedural History

The disagreement about ExxonMobil's duty to defend and indemnify BP in the Greenpoint Contamination Litigation gave rise to the present action. On June 3, 2019, Plaintiff initiated this lawsuit, alleging that Defendant had breached the 1993 Agreement. (*See* Dkt. 1.) Plaintiff sought reimbursement of costs and expenses it accrued while defending the Greenpoint Contamination Litigation and a declaration that Defendant had a duty to reimburse BP. (*Id.*) Defendant first answered the Complaint on June 26, 2019, and later filed an Amended Answer on June 9, 2020. (Dkts. 8, 22.)

After engaging in discovery, the parties cross-moved for summary judgment on April 9, 2021. (Dkts. 36–37.) The Court denied in part and granted in part the summary judgment motion on September 28, 2022. (Summ. J. Mem. & Order, Dkt. 43, at 1, 34.) In its summary judgment decision, the Court found that, pursuant to the 1993 Agreement and the 2004 Agreement, ExxonMobil had a duty to defend and indemnify BP in the Greenpoint Contamination Litigation against all claims brought by the civil plaintiffs, "with the exception of claims related to contamination located under the BP Terminal and claims for remediation (injunctive relief) of the Greenpoint Contamination." (*Id.* at 34); *BP Prods. N. Am. Inc.*, 2022 WL 4538555, at *15. The Court otherwise found that there remained disputed issues of material facts regarding: (1) whether BP had waived and was equitably estopped from asserting its claims in this action; and (2) the reasonable amount of fees and costs BP had to expend in its defense against claims that should have been defended by ExxonMobil pursuant to the parties' 1993 Agreement and 2004 Agreement. (*Id.* at 34); *BP Prods. N. Am. Inc.*, 2022 WL 4538555, at *15.

Trial was held between October 16–19, 2023. (*See* 10/16/2023, 10/17/2023, 10/18/2023 & 10/19/2023 Min. Entries.) Based on its summary judgment decision, the Court ruled at a motion

*in limine* hearing, (Mot. *in Limine* Hrg. Tr., Dkt. 105-1 ("MIL Hrg. Tr."), at 157:20–158:8), and

subsequently instructed the jury, that:

> ExxonMobil was obligated to defend and indemnify BP for claims arising out of or
> otherwise relating in any way to environmental contamination associated with any
> portion of the Greenpoint Contamination or any dissolved substances associated
> with the liquid plume that were not located under the BP Terminal or that did not
> seek remediation by BP of any alleged contamination.

(Jury Instrs., Dkt. 94 ("Jury Instrs."), at 11.)  The Court defined these claims as "covered" claims,

and all other claims as "non-covered" claims.  (*Id.*)  The Court further clarified that claims "seeking

money to be paid by BP into a fund so that a party *other* than BP can engage in

remediation . . . [were] *not* claims for remediation [and were therefore covered claims.]"  (*Id.* at

12.)  It was up to the jury to decide whether the civil plaintiffs in the Greenpoint Contamination

Litigation "sought damages or remediation, or whether their claims were covered or non-covered."

(*Id.*)  Where attorney work could have been relevant to both a noncovered and covered claim, the

jury was instructed to use "sound judgment in evaluating the nature of the work . . . drawing

reasonable inferences where you deem appropriate from the facts and circumstances in evidence."

(*Id.* at 11.)

On October 19, 2023, the jury returned a verdict against BP, finding that BP did not prove

by a preponderance of the evidence that ExxonMobil breached the 1993 Agreement, as modified,

in effect, by the 2004 Agreement.  (Jury Verdict Sheet, Dkt. 95, at ECF 1.)

On November 16, 2023, Plaintiff filed a motion for a new trial.  (Mem. L. Supp. Pl.'s Mot.

New Trial, Dkt. 102 ("Pl.'s Mem.").)  On January 15, 2024, Defendant filed its opposition.  (Mem.

L. Opp'n Mot. New Trial, Dkt. 104 ("Def.'s Opp'n").)  The motion was fully briefed when Plaintiff

filed its reply on February 5, 2024.  (Reply Mem. in Supp. of Mot., Dkt. 106 ("Reply Mem.").)

## LEGAL STANDARD

Rule 59(a) empowers a district court to set aside a jury verdict and order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The decision whether to grant a new trial following a jury trial under Rule 59 is 'committed to the sound discretion of the trial judge.'" *Stoma v. Miller Marine Servs., Inc.*, 271 F. Supp. 2d 429, 431 (E.D.N.Y. 2003) (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)). When deciding a Rule 59(a) motion, a district court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). Jury verdicts, however, "should be disturbed with great infrequency." *Id.* "A motion for a new trial should ordinarily be denied 'unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 404 (E.D.N.Y. 2014) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir.1998)); *accord Tesser v. Bd. of Educ.*, 370 F.3d 314, 320 (2d Cir. 2004).

## DISCUSSION

In support of its motion for new trial, Plaintiff argues that the jury's finding was against the weight of the evidence, (Pl.'s Mem. at 5–18), and that the jury instructions—specifically, the use of the word "claims"—were erroneously narrow, (*id.* at 18–20). The Court considers each of these arguments in turn.

## I.    The Weight of the Evidence

At trial, BP had the burden of proving each of the four elements of its breach of contract cause of action by a preponderance of the evidence. (Jury Instrs. at 10.) Only two of those elements are at issue in this motion, i.e., whether BP incurred legal fees defending against covered

claims and whether ExxonMobil failed to perform its obligations under the 1993 Agreement. (Pl.'s Mem. at 5; Jury Instrs. at 10.) The verdict sheet did not ask the jury to elaborate on its findings as to each of the four elements. Instead, the jury answered "No" to only one question: "Did Plaintiff [BP] prove, by a preponderance of the evidence, that Defendant [ExxonMobil] breached the 1993 Agreement, as modified, in effect, by the 2004 Agreement (pursuant to the Court's ruling)?"[7] (Jury Verdict Sheet, Dkt. 95, at ECF 1.) For the reasons discussed below, the Court is not convinced that the jury's verdict was "seriously erroneous or a miscarriage of justice." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002).

### A.    Evidence of Legal Fees BP Incurred in Defense of Covered Claims

BP first contends that the civil plaintiffs in the Greenpoint Contamination Litigation brought allegations constituting "covered claims," since the underlying complaints involved "petroleum [that] had migrated [from the BP Terminal] onto the [civil] plaintiffs' properties [i.e., not physically located under the BP Terminal]," and since each of the underlying complaints sought damages. (Pl.'s Mem. at 6; *Baumbach* Fifth Am. Compl. at 187–88, 199–201; *Spiroff* Am. Class Action Compl. at 17, 36–40.) BP then points to the trial testimony of BP former counsel Vilia Drazdys as connecting these covered claims to the approximately $4.3 million in legal fees that BP incurred. (Pl.'s Mem. at 9–10.) Attorney Drazdys testified that the relevant legal work performed for BP included the retention of an expert to determine plaintiffs' property value losses; an epidemiologist and toxicologist to medically assess the civil plaintiffs; an environmental engineer to investigate the scope of the petroleum migration, which was "directly relevant" to the

---

[7] Since the jury answered "No" to the first question, it did not need to answer the second question about causation of Plaintiff's injuries, which corresponds to the fourth element of a breach of contract claim and is not at issue in this motion. (*See* Jury Verdict Sheet, Dkt. 95, at ECF 1; Jury Instrs. at 10.)

civil plaintiffs' demand that the defendants pay money into a fund for remediation;[8] professional property appraisers and engineers to inspect the civil plaintiffs' homes; legal research on the civil plaintiffs' damages claims for petroleum migration onto their properties; and "hundreds of depositions . . . relating to [the civil] plaintiffs' damage claims." (Pl.'s Mem. at 9–10; *see also* Tr. at 414:2–416:9, 423:8–424:6, 451:16–452:13, 454:4–465:10.)

In response, Defendant points to the trial testimony of ExxonMobil's corporate representative, Reid Gettys; ExxonMobil's counsel in the underlying litigation, Michael Hall; and BP's Answer and deposition testimony in the underlying litigation, to argue that "non-covered claims and allegations permeated each individual demand" in the underlying complaints. (Def.'s Opp'n at 8; *see* Tr. at 879:1–10 (presenting Gettys' testimony that the claims sought "[r]emediation, forcing the companies to remediate"), 791:11–23 & 792:3–8 (presenting Gettys' testimony that "[e]very single claim includ[ed] a request that the parties be ordered to clean up" and "if you look at it collectively these plaintiffs restated that request, that demand, over 200 times; over 200 times they said, force the parties to clean up"), 884:9–891:15 (presenting Hall's testimony that remediation was "tied to all claims" and that civil plaintiffs were alleging failure-to-warn about the "hazardous condition under the BP property as well as migration").) Defendant further questions the credibility of Attorney Drazdys, who worked as in-house counsel for BP starting about three years into the Greenpoint Contamination Litigation, supervised outside counsel who were handling the matter, and testified, in part, to her *belief* on the work that was performed before she joined the case. (Def.'s Opp'n at 11; *see* Tr. at 427:8–14; *see also id.* at 440:1–9 (Court's instruction to the jury: "Ladies and gentlemen, . . . you may be reading statements that have a truth

---

[8] The Court once again notes that "seeking money to be paid by BP into a fund so that a party *other* than BP can engage in remediation, . . . based on the 2004 Agreement, . . . is *not* a claim for remediation" and is thus a covered claim. (Jury Instrs. at 12.)

component to them; in other words, they're stating some fact that might have occurred, that the witness says occurred. But you're not to accept the statements for the truth of the matter, what the witness is saying happened. But rather, the relevance is that this witness reviewed those statements and that somehow informed how she approached the billing that is at issue here.").) Further, Defendant emphasizes that BP's billing records were "vague" and "made it impossible for the jury to ascertain the work BP's lawyers actually performed." (*See* Def.'s Opp'n at 10–11. *See generally* Exs. K–R of Crozier Decl., Dkts. 105-11 to 105-18 ("BP Invoices").)

Here, an examination of the billing records shows just that. As a preliminary matter, most of BP's billing records were inconclusive as to whether the work performed could be readily attributable to a covered or non-covered claim. BP did not use task codes, (*see* Tr. at 742:16–743:3 (Drazdys: "On these paper invoices, [task codes] are not here. I do not recall if they were task[] code billing in our electronic system when they made it into the system.")), and several of its time entries contained summary descriptions of activities such as "review complaint," "review expert reports," "draft memos," etc., with only a handful of explicit references to remediation or damages, (*see generally* BP Invoices, Dkts. 105-11 to 105-18). In its reply brief, BP argues that its billing records "contain[ed] large amounts of entries analyzing or responding to expert reports" and that "ExxonMobil does not attempt to argue that these reports were relevant to claims for injunctive relief, which of course would make no sense." (Reply Mem. at 3.) But BP provides no further explanation as to why expert reports would not be relevant or necessary to defending against remediation claims. Indeed, a jury could reasonably find that the expert epidemiology and toxicology reports medically assessing the civil plaintiffs, (*see* Exs. G & I of Cooperman Decl., Dkts. 102-9 & 102-11), were useful for determining the scope of the injury the civil plaintiffs

experienced, if any, as a result of the alleged contamination, and could thus be highly relevant, if not essential, to defenses against remediation claims in the underlying litigation.

Similarly, Plaintiff's argument that the home inspections it performed "could not credibly" relate to claims for remediation is unpersuasive. (*See* Reply Mem. at 3 (stating that the total fees for "hundreds of home inspections" conducted "were more than $400,000").) BP's former counsel Drazdys testified that home inspections involved the retention of "scientist[s] to look at" allegations of "vapors coming into the[] home from the contamination . . . underneath" as well as an appraiser for estimating the real estate value of the civil plaintiffs' properties. (Tr. at 452:1–13.) ExxonMobil's corporate representative Gettys, in describing the scope of remediation, explained that home inspections are often a necessary first step for investigating possible remediation of contamination. (*See id.* at 785:2–786:4 ("[Y]ou first go do testing to find out if it's there. If you discover it and it's there, you have to find out where it is, so the extent of where it is. . . . That if there is vapor[] that [is] arising from the contamination, you've got to figure out not only how to get rid of the source [of] the contamination, then you got to figure out how to remediate the vapors.").) Further, the settlement in the *Baumbach* lawsuit explicitly provided for vapor mitigation and remediation of contamination, indicating that claims for remediation were a part of the underlying litigation until the very end. (*Id.* at 805:19–806:3 (describing paragraph 8 of the *Baumbach* settlement release).)

It is true that at least one of the expert reports BP produced was explicitly dedicated to assessing the civil plaintiffs' property damages. (*See* Ex. H to Cooperman Decl., Dkt. 102-10.) The legal fees incurred for producing this report are clearly attributable to claims covered by the 1993 Agreement, since the report concerns damages claims for contamination not located under the BP terminal. A reasonable jury could have concluded, however, that a single expert report

appraising property damages, without more or clearer time entries attributable to covered claims, was overall insufficient evidence for BP to meet its burden of proof. A party's failure to prove its claim by a preponderance of the evidence does not necessarily mean that there is no evidence in the record supporting that claim—it simply means that there is not sufficient evidence that would satisfy the relevant legal standard.

For example, a reasonable jury could have considered evidence of the fees incurred for the damages expert report, alongside other time entries for ostensibly covered claims, and weighed them against the rest of the billing records, ultimately concluding that the cumulative evidence was evenly balanced or inconclusive.[9] "[W]here the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001); *see also Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 118 (2d Cir. 1999) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." (quoting *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994)); *Waterloo Cap. Partners, LLC v. BWX Ltd.*, No. 18-CV-6542 (RA), 2022 WL 2063762, at *18 (S.D.N.Y. June 8, 2022) (similar). For these reasons, the jury's verdict indicating that BP did not prove this element by a preponderance of the evidence was not a "miscarriage of justice." And aside from the billing records, the remaining evidence at trial rested on the relative credibility of the parties' respective witnesses, particularly that of BP's witness

---

[9] For these reasons, the Court similarly rejects Plaintiff's argument that the jury's answer to the first verdict was "literally impossible" and that "the jury's answer . . . necessarily meant that the jury found that BP incurred no fees related to covered claims." (Pl.'s Mem. at 17; *see also* Reply Mem. at 2.) Once again, this is incorrect. A jury verdict against Plaintiff means that Plaintiff failed to prove by a *preponderance* of the evidence that the legal fees it incurred were for covered claims. This may include situations where the evidence regarding what work was performed for what type of claim is evenly balanced or inconclusive, with some evidence supporting each side.

Attorney Drazdys.  If "[the jury's] finding turned to a large extent on the credibility of [one] witness[] who testified before the jury, the finding and the verdict which followed are particularly ill-suited to after-the-fact second guessing."  *ING Glob. v. UPS Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014).

BP further argues that there is "virtually no evidence" that it incurred any fees defending against "a motion for injunctive relief," implying that all of its fees must therefore be attributable to claims for damages rather than remediation.  (Pl.'s Mem. at 12.)  Whether or not BP defended against a motion for an injunction in the underlying litigation is irrelevant to this analysis. Defendant does not dispute that a motion for an injunction was never filed in the underlying action. Indeed, BP attempts to conflate a *motion* for an injunction with injunctive relief *generally*.  As the Court found in its summary judgment decision, the underlying complaints in the Greenpoint Contamination Litigation sought injunctive relief even though the civil plaintiffs did not separately move for an injunction during the litigation.  (*See* Summ. J. Mem. & Order, Dkt. 43, at 20 ("BP's assertion that the Greenpoint Contamination Litigation did not seek injunctive relief is plainly incorrect."); *see also* Tr. at 894:24–895:3, 897:23–898:4 (testimony of ExxonMobil witness Michael Hall stating that while the civil plaintiffs in the Greenpoint Contamination Litigation could have moved for an injunction, they did not).)  Plaintiff maintains that injunctive relief was unnecessary because "ExxonMobil and BP were already obligated to remediate the Greenpoint area pursuant to Orders on Consent that they had signed with the New York State Department of Environmental Conservation."  (Pl.'s Mem. at 12.)  But the existence of a consent order does not mean that the civil plaintiffs could not still seek remediation in the Greenpoint Contamination Litigation.  (*See, e.g.*, Tr. at 733:14–16 ("Q: Well, just because the DEC orders BP to clean up

13

petroleum under its own property, that doesn't mean that the plaintiffs can't allege that BP failed to do it, right?  [Drazdys] A: Sure, they can allege anything, sure.").)

Lastly, in the present action, even if the jury found that BP had incurred fees in defending against covered claims, there were other decisional points at which the jury could still have found against BP.  For example, the jury could have concluded that BP did not prove by a preponderance of the evidence that ExxonMobil failed to perform its obligations under the 1993 Agreement because ExxonMobil, in fact, defended both companies—despite BP deciding to litigate separately on its own—in the underlying litigation.  Defendant argues as much in its opposition papers, (*see* Def.'s Opp'n at 12–14), and Plaintiff does not directly respond to this argument.  Defendant points to testimony by Gettys that ExxonMobil *did* defend BP against covered claims in the underlying litigation, resulting in attorney fees that were "at least twice of what [BP's] attorney fees were." (*See* Tr. at 871:6–24.)  Defendant also highlights testimony by Hall (the attorney who represented ExxonMobil in the underlying action), that ExxonMobil "took the lead in defending" against all claims, including covered claims, in the underlying litigation, (*id.* at 892:12–14), and ultimately secured a release of all claims when settling the underlying litigation, (*see* Def.'s Opp'n at 8; *see also* Settlement of Greenpoint Claims Ltr. Understanding, Dkt. 105-8, at 11, 12).  Based on the entire evidentiary record, a reasonable jury could have concluded that ExxonMobil performed its obligations to defend BP against the covered claims in the underlying litigation by incorporating those claims into its own defense and relying on its own lawyers to defend both companies in that litigation, and that requiring ExxonMobil to pay for fees incurred by BP's lawyers for defending against the same exact claims would have been "duplicative" and thus not required by the 1993 Agreement.  (*See* Def.'s Opp'n at 13.)

**B.    Defendant's Use of the Phrase "Claims Related to Contamination Located Under the BP Terminal"**

Plaintiff contends that Defendant's use of the phrase "[claims] related to contamination located under the BP Terminal" (referring to "claims" made in the Greenpoint Contamination Litigation), allowed it to expand the breadth of what should be considered a non-covered claim. (Pl.'s Mem. at 15–17.)  This issue was the subject of *in limine* motions and a hearing, where Defendant's counsel sought to use this phrase to argue that claims "directed at contamination located under the BP [T]erminal . . . [such as] the premises liability [claims], the failure to warn [claims]" were non-covered claims.  (*See* MIL Hrg. Tr. at 116:18–117:10.)  The Court considered this question in some depth and ultimately allowed Defendant to make this argument at trial and for Plaintiff to make its own counterarguments.  (*Id.* at 119:15–120:5.)

At trial, Defendant's counsel employed this phrase—"claims related to contamination located under the BP Terminal"—in his opening, stating that the Greenpoint Contamination Litigation "asserted numerous claims, including non-covered claims related to contamination located under the BP Terminal, such as claims for premises liability, failure to warn, and deceptive business practices."  (*See, e.g.*, Tr. at 244:2–6.)  Then, following an objection to a witness's testimony, the Court held a sidebar conference, where Plaintiff's counsel once again alleged that Defendant was attempting to use this phrase to suggest that "if a claim may have been for off-site contamination, . . . [and] relates to the BP Terminal, then it's not covered."  (*See id.* at 308:13–19.)  Defense counsel disputed this characterization, emphasizing once again that this phrase was simply meant to capture claims about contamination located under the BP Terminal, such as premises liability and failure-to-warn claims.  (*Id.* at 309:4–10.)  The Court allowed defense counsel to proceed with this argument, indicating that Plaintiff was free to rebut the argument by explaining to the jury that failure-to-warn claims and premises liability claims "necessarily are

15

covered [claims] because they relate to the contamination into . . . the [civil] plaintiffs' own premises." (*Id.* at 312:2–16.) The same dispute later resurfaced during the jury charge conference. This time, the Court agreed with Plaintiff's concern and subsequently removed the phrase "claims related to contamination that was located in the BP Terminal" from the jury instructions. (*Id.* at 666:10–15, 669:9–22.)[10] Nevertheless, the Court maintained that it did not believe that the use of this phrase at trial materially impacted the jury's understanding of the case, nor that the parties had argued anything they should not have. (*Id.* at 667:13–25.) Accordingly, Defendant now argues that "[a]ny 'confusion' BP suggests that ExxonMobil created was, in effect, remedied when BP got the very instruction it wanted on this issue" at the jury charge conference and in the jury instructions. (Def.'s Opp'n at 15; *see* Jury Instrs. at 10–11.)

Challenges to arguments by counsel are subject only to deferential review. *Harewood*, 64 F. Supp. 3d at 404 (citing *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006)). The Court's opinion on this dispute has not changed. Defendants used the disputed phrase "claims related to contamination located under the BP Terminal" at trial only when eliciting testimony about the purportedly non-covered claims of premises liability, failure-to-warn, and unfair business practices. (*See* Tr. at 777:11–18, 797:16–797:20 (asking Gettys about claims "such as premises liability and failure to warn"), 888:5–15 (asking Hall about the premises liability claim).) The Court held at multiple points during the trial, and continues to believe, that this question fell within

---

[10] In sum and substance, the dispute was about whether the phrase in the jury instructions, "claims related to contamination located under the BP Terminal," would mislead the jury into thinking that claims based on contamination that originated under the BP Terminal but then migrated to the civil plaintiffs' property were non-covered claims. (*Id.* at 667:20–25 (The Court: "I think, however, Mr. Cooperman is right, that the word[s] 'claims related to contamination located under the BP Terminal' could be misread to even include contamination that migrates from underneath the BP Terminal, which we all agree could be included, except to the extent that it relates to remediation claims.").)

the scope of what could be reasonably argued either way before the jury. Defendant was free to argue that premises liability and failure-to-warn claims pertained to contamination located under the BP Terminal itself and should therefore be considered *non-covered* claims. At the same time, Plaintiff was free to argue that such claims were necessarily *covered* claims because the contamination had to migrate onto the civil plaintiffs' properties for there to be any damages alleged by those plaintiffs in the first place. In any case, "a party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as '[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.'" *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (quoting *Reilly v. Natwest Mkts. Grp., Inc.*, 181 F.3d 253, 271 (2d Cir. 1999)). The Court therefore does not find that use of the phrase "claims related to contamination located under the BP Terminal" resulted in a miscarriage of justice warranting a new trial.

**II.   Jury Instruction Regarding Scope of ExxonMobil's Indemnification Duty**

Plaintiff argues that "[t]he Court's jury instructions relevant to the first Jury Verdict Sheet question erred by focusing solely on whether BP 'incurred legal fees in its defense of claims' . . . when the unambiguous contract provision in the 1993 Agreement was far broader." (Pl.'s Mem. at 18 (quoting Tr. at 1070:10–15).)[11] Reciting the provision in the 1993 Agreement that obligates ExxonMobil to defend and indemnify BP "from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including any attorney's fees)," Plaintiff asserts that the Court's instructions improperly narrowed the text

---

[11] The full sentence in the jury instructions read: "With respect to the second element, you must determine whether BP has proved, by a preponderance of the evidence, that it incurred legal fees in its defense against claims that should have been defended by ExxonMobil pursuant to the 1993 Agreement, as modified, in effect, by the 2004 Agreement." (Jury Instrs. at 10.)

of the 1993 Agreement by not including in the jury charge the Agreement's reference to "costs or expenses (including any attorney's fees)." (*Id.* at 18–19 (emphasis omitted).) Plaintiff further suggests that it was entitled to recover costs and expenses even if they were unrelated to defending against the claims in the Greenpoint Contamination Litigation. (*Id.* at 18 ("And by only mentioning 'claims,' the jury was led to believe that what was at issue was only the allegations made by the civil plaintiffs, as opposed to the costs and expenses incurred by BP."); *see also* Tr. at 916:22–25 ("[Counsel for Plaintiff:] So the concern that we have is [using only "claims" instead of the full provision of the 1993 Agreement] means that folks, the jury, will look just at claims in a complaint and make a decision about covered versus noncovered, where what we bargained for was broader than that.").)[12] Plaintiff is wrong on all counts.

"[A] jury instruction will be deemed adequate, so long as the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016) (alteration in original) (quoting *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 998 (2d Cir. 1991)). An instruction can be considered erroneous where it confuses the jury's understanding of the proper legal standard or does not "adequately inform the jury of the law." *Hester v. BIC Corp.*, 225 F.3d 178, 186 (2d Cir. 2000). If the instruction, viewed as a whole, is

---

[12] During the charge conference, Plaintiff also argued that using only the word "claims" would result in the jury disregarding any evidence beyond the text of the complaints themselves. (*See* Tr. at 921:25–922:5 ("[Counsel for Plaintiff:] [T]he point we want to make here [is that] . . . a jury can just say all I need to do is look at the complaint, stop, and if there's a noncovered claim, end of story. That's not the way this provision reads."); *see also id.* at 923:1–9 ("[W]e had Ms. Drazdys talk not just about the complaints that were filed, but . . . [also] depositions and expert reports and property inspections and the like. So our point is it would be misleading for the jury to come out of these instructions saying I just need to look at the complaint, full stop.").) The Court rejected this argument, stating that the jury was "going to be instructed that they should consider all the relevant evidence, and both sides put on witnesses who testified at length about the nature of the claims and the work." (*Id.* at 923:11–14.)

correct, then it "will not be disturbed." *Stern v. Shammas*, No. 12-CV-5210 (NGG) (RER), 2015 WL 6440647, at *7 (E.D.N.Y. Oct. 21, 2015), *aff'd sub nom. Stern v. City of New York*, 665 F. App'x 27 (2d Cir. 2016) (summary order).

Plaintiff is seeking to relitigate an issue that the Court resolved in its summary judgment decision prior to trial. There, the Court held that the 2004 Agreement had a modifying effect on Defendant's duty pursuant to the 1993 Agreement to indemnify BP's legal fees: cabining that duty to "all claims, with the exception of claims related to contamination located under the BP Terminal and claims for remediation (injunctive relief) of the Greenpoint Contamination." (Summ. J. Mem. & Order, Dkt. 43, at 34.) Though the Court entertained Plaintiff's concerns at considerable length during the charge conference, (*see* Tr. at 916:15–933:17), it ultimately concluded that using the broader language of the 1993 Agreement would "ignore[] the effect of the 2004 [A]greement which limited . . . implicitly the fees that [BP] could get reimbursement for to [those] claims that are not remedial," (*id.* at 931:8–11). As the Court explained then, and reiterates now, there "has to be an analysis of the claims first and then the attorney's fees related to those claims." (*Id.* at 931:11–12.)

For the same reasons, the Court rejected yet another of Plaintiff's requests to instruct the jury to consider both the "claims" and other "substantive work done" by BP's lawyers in determining whether the civil plaintiffs sought damages or remediation.[13] (Pl.'s Mem. at 19 (quoting Tr. at 674:7–24).) The Court denied this request, explaining, that "[t]he question is whether or not the work [BP] did was addressing the claims that were brought, and that is to be

---

[13] Plaintiff's request pertained to the following sentence of the final jury instructions: "In determining whether the plaintiffs in the Greenpoint Contamination Litigation sought damages or remediation, or whether their claims were covered or non-covered, you may consider the claims and allegations in the complaints in those cases." (Jury Instrs. at 12.)

determined based on the litigation that [the parties have] been allowed to introduce at some length and . . . the complaints [the parties have] been allowed to introduce and the claims and allegations in those complaints." (Tr. at 676:14–20.)

Thus, the Court fundamentally disagrees with Plaintiff that, after the 2004 Agreement, BP was entitled to be reimbursed by ExxonMobil for any and all costs and attorneys' fees incurred in the underlying litigation, even if unrelated to covered claims. It was therefore proper for the jury to be instructed to only consider "the parties' respective rights and obligations through the lens of what the underlying [litigation] [p]laintiffs had alleged." (Def.'s Opp'n at 5.) As the Court explained during the charge conference, "once you have the 2004 [A]greement, the only way to make sense of the two agreements in tandem is to require that the work [was] done on claims that are covered[,] and now that doesn't include any more claims for remedial relief." (Tr. at 930:16–20.)[14]

Accordingly, because the Court's instructions to the jury adequately informed them of the law, no new trial is warranted.

---

[14] To the extent that Plaintiff is arguing that because the Court's jury instructions referred only to "claims" and not "costs and attorneys' fees," the jury was misled into thinking that BP was not entitled to reimbursement of its costs and attorneys' fees, that argument is completely belied by the entire record. It was abundantly clear from the jury instructions, and from the contents of the trial itself, that this action was all about BP recouping attorneys' fees and costs it incurred defending itself in the Greenpoint Contamination Litigation.

SPA-56

## CONCLUSION

For the reasons set forth above, the Court finds that the jury's verdict was not against the weight of the evidence and the jury instructions were not erroneously narrow.  Accordingly, the Court denies Plaintiff's motion for a new trial pursuant to Rule 59(a).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2024
       Brooklyn, New York